Arthur J. Abramowitz (*pro hac vice pending*)
Email address: aabramowitz@cozen.com
Brian P. Flaherty (*pro hac vice pending*)
Email address: bflaherty@cozen.com
Eric L. Scherling (*pro hac vice pending*)
Email address: escherling@cozen.com
COZEN O'CONNOR
1900 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-4647
Facsimile: (215) 701-2191

Marc S. Cohen (Bar Number 65486)
Email address: mcohen@kayescholer.com
Ashleigh A. Danker (Bar Number 138419)
Email address: adanker@kayescholer.com
KAYE SCHOLER LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-1000
Facsimile: (310) 788-1200

Attorneys for Plaintiff
FOAMEX INNOVATIONS OPERATING COMPANY

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re<br><br>DAVID L. FARLEY, Debtor and<br>Debtor-in-Possession<br><br><br><br>FOAMEX INNOVATIONS OPERATING<br>COMPANY<br>Rose Tree Corporate Center II<br>1400 Providence Road, Suite 2000<br>Media, Pennsylvania 19063-2076,<br><br>        Plaintiff,<br><br>   v.<br><br>DAVID L. FARLEY, Debtor and<br>Debtor-in-Possession<br>2891 Venezia Terrace<br>Chino Hills, CA 91709 | Case No. 6:11-bk-12031-DS<br><br>Chapter 11<br><br>Adv. Pro. No. 6:11-ap-_____<br><br><br>**COMPLAINT FOR: (I) BREACH OF CONTRACT, (II) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, (III) BREACH OF FIDUCIARY DUTY TO CREDITORS AS OFFICER AND DIRECTOR OF INSOLVENT CORPORATION, AND (IV) BREACH OF FIDUCIARY DUTY TO CREDITORS AS DEBTOR-IN-POSSESSION** |

1 | and                                              )
2 | ANATOMIC GLOBAL, INC.                            )
  | 1241 Old Temescal Road                           )
3 | Corona, California 92881,                        )
4 |                 Defendants.                      )
5 |                                                  )
6 |                                                  )
7 |                                                  )

8      Plaintiff Foamex Innovations Operating Company ("FXI") files this Complaint against

9 David L. Farley ("Farley" or "Debtor") and Anatomic Global, Inc. ("AGI").  In support of this

10 Complaint, FXI avers as follows:

**PARTIES**

11     1.     Plaintiff FXI is a Delaware corporation with its principal place of business at Rose

12 Tree Corporate Center II, 1400 Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.

13     2.     Defendant David L. Farley is an individual citizen of the state of California who

14 resides at 2891 Venezia Terrace, Chino Hills, California, 91709.  On January 21, 2011, Debtor

15 filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the

16 "Bankruptcy Code").  Debtor continues to operate as a debtor-in-possession pursuant to Sections

17 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed as

18 of the date hereof.

19     3.     Defendant AGI is a California corporation with its principal place of business at

20 1241 Old Temescal Road, Corona, California 92881.

**PRELIMINARY STATEMENT**

21     4.     FXI brings this adversary proceeding, pursuant to Rule 7001 of the Federal Rules of

22 Bankruptcy Procedure, to restrain Debtor and AGI, a corporation of which Debtor is the sole

23 owner, the sole director and the Chief Executive Officer, from following through on threats to

24 harm creditors by destroying value of the business enterprise.

KAYE SCHOLER LLP

5.    Plaintiff is a creditor of AGI and the Debtor.  Debtor has guaranteed the indebtedness of AGI to FXI, which guaranty is secured by the Debtor's pledge of his stock in AGI.

6.    The stock owned by Debtor in AGI constitutes, upon information and belief, the principal asset of his bankruptcy estate; to date, Debtor has not filed schedules or a statement of financial affairs.  The actions complained of in this matter are actions taken by Debtor in his role as the controlling party of AGI.  They are taken or threatened to be taken by Debtor for the express purpose of diminishing the value of AGI, and thereby adversely impacting both the creditors of AGI and the creditors of Debtor, who have a critical interest in the value of AGI, Debtor's principal asset.

7.    Consequently, the wrongful conduct of Debtor, and of AGI, whose actions are taken at Debtor's direction, complained of herein are having and, unless restrained, will continue to have a direct adverse effect on the bankruptcy estate and will result in immediate and substantial irreparable harm to creditors of the estate.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Court also has diversity jurisdiction since the plaintiff and defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.    This matter is a core proceeding under 28 U.S.C. 157(b)(2)(A) and (O).

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## FACTUAL ALLEGATIONS

### INTRODUCTION

11.    FXI is in the business of manufacturing a large range of foam products for use in a variety of applications.

12.    AGI is in the business of manufacturing mattresses and sleep accessories using FXI's foam products.

13.     FXI and AGI have had a longstanding relationship during which FXI supplied large quantities of foam to AGI.

14.     As explained in further detail below, AGI is indebted to FXI in two separate ways. First, AGI owes to FXI approximately $2.3 million for polyurethane foam purchased in accordance with the terms of a Supply Agreement dated May 18, 2010 ("Supply Agreement").  Second, AGI owes approximately $4.6 million in principal and interest to FXI pursuant to the terms of a loan, as evidenced by the Second Amended and Restated Promissory Note, as further amended (hereinafter the"Note").  Debtor is indebted to FXI because he guaranteed all of AGI's obligation to FXI, and to secure that indebtedness he granted a security interest to FXI in stock he owns in AGI.

<u>THE HISTORY OF THE RELATIONSHIP BETWEEN AGI AND FXI</u>

15.     For many years, FXI and AGI have done business with each other, with FXI manufacturing foam and selling it to AGI, which uses the foam as the primary component in the products it sells.

16.     AGI had, on occasion, in the past borrowed funds from FXI.  In 2005, AGI borrowed approximately $1.3 million from FXI pursuant to an Amended and Restated Promissory Note dated September 18, 2005.

17.     AGI has become financially troubled.  At first, this manifested itself in a delinquency in the payment of accounts receivable due to FXI.  AGI's financial difficulties escalated to the point where its continued existence was threatened.  AGI required a substantial capital infusion to continue its operations.

18.     In early 2010, AGI requested an additional loan from FXI in a substantially higher amount, and FXI agreed to make a loan to AGI in the principal sum of $4,539,937.32 in May 2010. AGI asserted that the proceeds of this loan and additional credit terms offered by FXI would provide it with adequate working capital.

19.     To this end, on May 18, 2010, FXI and AGI entered into a Loan and Security Agreement ("Prior Loan Agreement") and AGI gave a Second Amended and Restated Promissory Note dated that same day in the amount of $4,539,937.32.  Under the Prior Loan Agreement, AGI granted a security interest to FXI in substantially all of its assets, including, but not limited to, all

KAYE SCHOLER LLP

1  of its accounts receivable, equipment and inventory.  In addition, Debtor guaranteed the obligations

2  of AGI to FXI.

3      20.      At the same time, AGI entered into a Supply Agreement with FXI.  In the Supply

4  Agreement, AGI agreed to purchase 100% of its requirements for certain polyurethane foam

5  products from FXI, with certain limitations.

6      21.      Within several months, however, it became apparent that AGI's plans for financial

7  stability were not working, and AGI needed additional funding.  AGI sought additional funding

8  from third parties, including Celtic Capital Corporation ("Celtic").  Although Celtic was willing to

9  provide funding to AGI, in the form of a $2.5 million revolving line of credit, as a precondition for

10  doing so, Celtic required that FXI agree to subordinate its security interest in virtually all of the

11  AGI collateral which served as security for repayment of the FXI loan.

12      22.      FXI's doing so would constitute a material modification in FXI's lending

13  relationship with AGI and Farley, since not only would AGI be undertaking greater financial

14  obligations, thereby increasing the probability that AGI would default on its obligations to FXI, but

15  it would also require FXI to subordinate its status as AGI's senior lien holder.

16      23.      Nevertheless, at AGI's and Farley's request, in order to make possible the new

17  financing being provided by Celtic, FXI agreed to subordinate its security interest in the assets of

18  AGI, but only on the condition that Farley pledge his stock in AGI as security for his guaranty

19  obligation on AGI's indebtedness to FXI.

20      24.      The transaction closed on November 10, 2010.  On that day, FXI and AGI modified

21  their May 2010 Prior Loan Agreement by entering into an Amended and Restated Loan and

22  Security Agreement ("Amended Loan Agreement").  *See* Exh. A, hereto.  The Amended Loan

23  Agreement amended and restated the Prior Loan Agreement in its entirety.  Pursuant to its terms,

24  interest on the unpaid principal is due monthly until March 15, 2011 and on April 15, 2011, both

25  interest and principal are due monthly in accordance with an agreed upon repayment schedule.

26      25.      As was the case under the Prior Loan Agreement, in the Amended Loan Agreement

27  AGI granted security interests to FXI in substantially all of its assets, including, but not limited to,

28  all of its accounts receivable, equipment and inventory.  As required by Celtic, however, FXI

KAYE SCHOLER LLP

1    agreed to subordinate its security interest in all collateral except AGI's inventory, which constitutes

2    a relatively negligible portion of the overall collateral package, to Celtic.

3        26.    Under the Amended Loan Agreement, AGI made certain affirmative covenants. It

4    agreed to not change its name, business structure or identity, its principal place of business or chief

5    executive office, the location of Collateral or the place where debtor keeps its records concerning

6    the Collateral, or add any new fictitious name without notice to FXI. See Amended Loan

7    Agreement, paragraph 10(c). AGI also agreed to "keep in full force and effect its existence in good

8    standing, continue to conduct and operate its business substantially as presently conducted and

9    operate and maintain and protect all franchises, permits, licenses, trademarks, trade names and

10   contracts and preserve all the remainder of its material property used or useful in the conduct of its

11   business and keep the same in repair and condition." See Amended Loan Agreement, paragraph

12   10(f).

13       27.    Also on November 10, 2010, concurrent with the execution of the Amended Loan

14   Agreement, Celtic provided a $2.5 million revolving line of credit, pursuant to a loan agreement it

15   made with AGI ("Senior Loan Agreement"). Under the Senior Loan Agreement, AGI granted

16   security interests to Celtic in substantially all of its assets, including, but not limited to, all of its

17   accounts receivable and equipment, but excluding its inventory, which remained subject to FXI's

18   first-priority lien. Moreover, as requested by AGI and required by Celtic, FXI simultaneously

19   entered into a Debt and Lien Subordination Agreement with AGI and Celtic ("Subordination

20   Agreement") pursuant to which FXI subordinated its interest in collateral other than inventory.

21       28.    Lastly, as a critical element of the transaction, to induce FXI to agree to the

22   Subordination Agreement and as consideration for same, David Farley entered in to a Pledge

23   Agreement by which he agreed to pledge all of his stock in AGI to secure his personal Guaranty of

24   AGI's obligations to FXI. In accordance with the Pledge Agreement, Farley delivered all of the

25   shares of AGI stock to the Wilmington Trust Company to hold as agent for FXI. The obligations

26   of Farley under the Guaranty and the Pledge Agreement are not subject to the Subordination

27   Agreement.

28       29.    Thus, as of November 10, 2010 the following structure was in place:

KAYE SCHOLER LLP

(a) AGI continued to operate, acquiring 100% of its foam requirements from FXI and incurring obligations to pay FXI for such foam pursuant to the terms of the Supply Agreement;

(b) AGI was obligated to repay Celtic pursuant to the terms of its $2.5 million revolving line of credit with Celtic;

(c) AGI was obligated to FXI pursuant to the terms of the Amended Loan Agreement, in the amount of approximately $4.5 million, and was obligated under the Supply Agreement, in the amount of approximately $2.3 million;

(d) Farley personally guaranteed all of AGI's obligations to FXI and pledged his AGI stock to secure such guaranty; and

(e) Farley transferred all of his AGI stock to Wilmington Trust Company to hold for the benefit of FXI pursuant to an escrow agreement.

30. It was hoped that, through the Celtic financing and the credit accommodations made by FXI, AGI would be able to successfully function. However, almost immediately, it became apparent that AGI could not do so.

31. As of January 28, 2011, AGI had failed to pay the approximately $2.3 million due to FXI under the Supply Agreement. Further, AGI has acknowledged that it is unable to pay the amounts due under the Amended Loan Agreement and Note. As a consequence, AGI is in default of its obligations under both the Supply Agreement and the Amended Loan Agreement, which provides that AGI is in default if it, "fails to pay when due all or any portion of the Obligations constituting a payment under the Supply Agreement, and such failure is not cured within any applicable notice and cure periods, if any, contained in the Supply Agreement". (Agreement, § 14(a)) Further, since AGI defaulted under the Amended Loan Agreement, FXI may and has since "[d]eclare[d] all Obligations . . . immediately due and payable." (Agreement, § 15.1(a).)

32. On January 28, 2011, FXI sent AGI a notice of default pursuant to Section 15.1(f) of the Amended Loan Agreement.

33. AGI has not cured its defaults, and has represented that it has no ability to cure them.

34.    Over the course of several weeks, there have been ongoing discussions between representatives of Farley, AGI and FXI in which the parties have attempted to rectify the ongoing default.

35.    Farley, AGI and FXI have been unable to achieve a resolution, and it has now become apparent to FXI that Farley and AGI have no intention of doing so except on terms that will purposefully deprive FXI of the protection of its rights as a creditor of both AGI and Farley.

36.    FXI attempted to work out a financial solution under which FXI would accept an 80% equity interest in AGI in exchange for its outstanding debt, which approximated $7 million dollars at that time. Farley stated his interest in such a solution at a meeting with FXI on January 13, 2011, although he also stated that he was having discussions with a third party as well. FXI had its counsel prepare a letter of intent setting forth the details of the offer as well as an employment agreement under which Farley would remain the CEO of AGI. Farley never gave FXI any indication that FXI's proposal was conceptually unacceptable.

37.    Since then, however, while FXI thought that Farley and AGI were proceeding in good faith, it has become apparent that AGI and Farley are not.

38.    While Farley and FXI have been in discussions with each other, Farley has also been in discussions with another possible lender, The Signet Group, LLC ("Signet"), possibly leading to the making of a loan or other investment by Signet into AGI, by which, among other things, AGI would raise funds with which to pay a portion (but not all) of the amounts due to FXI.

39.    Farley and AGI have concluded that it is in their interest to enter into a transaction with Signet, because Signet is apparently willing to make an investment in AGI on terms more favorable to Farley individually than those which FXI has stated it is willing to accept.

40.    However, due to FXI's rights under the various loan documents described above Farley and AGI are not free to accept Signet's offer without the consent of FXI. Unless FXI agrees to a $1 million "haircut" in repayment of its debt, and makes other concessions such as, for example, consenting to the issuance of additional stock that might be acquired by Signet, or releasing liens on certain collateral, Farley and AGI cannot consummate a transaction with Signet.

41.    As a consequence, Farley and AGI have resorted to conduct, including tactics in their negotiations with FXI, that are wrongful, including breaches of fiduciary duties to creditors and a stated intent to effect fraudulent transfers to the detriment of creditors, including FXI.

42.    Representatives of Farley and AGI have stated to representatives of FXI that Farley and AGI have no intention of entertaining terms of an arrangement with FXI, and that Farley and AGI would far prefer to accept an arrangement with Signet, even if the terms were not as favorable to AGI as terms offered by FXI. It has suggested to FXI that it be prepared to accept at least $1 million less than it is owed, thereby enabling Farley to retain a substantial ownership interest in AGI. In effect, by its actions AGI is attempting to force FXI to accept less than is its due, for the reason that it and Farley are intent on advancing and maximizing the personal interest of Farley, even if it means that AGI is not able to pay its obligations to its creditors, including, but not limited to FXI.

43.    In an effort to force FXI to give in to Farley's and AGI's demands, representatives of Farley and AGI have threatened that Farley and other members of AGI management would collectively "walk away", thereby jeopardizing the survival of the company and of its ability to repay its obligations to all of its creditors, including FXI. Since Farley has guaranteed AGI's obligations to FXI with his stock in AGI, and because it is unclear whether Farley has any unencumbered assets, destruction of AGI's value would render that guaranty effectively worthless.

44.    AGI and Farley are effectively threatening its creditors that they would rather destroy AGI than pay those creditors.

45.    More recently, on Thursday, February 3, 2011, representatives of AGI and Farley stated that the entire management team of AGI was prepared not only to close the doors of AGI, but to then establish a new company which will engage in precisely the same business as AGI is now operating, with capital to be supplied by Signet or another third party. The threat is to appropriate the valuable property of AGI, consisting of its employee relationships and valuable business information and know-how, to benefit of Farley in derogation of the rights of creditors.

46.    Upon filing a bankruptcy case, a debtor in possession ("DIP") owes a fiduciary duty to the estate's creditors, akin to that owed by a trustee.

47.    A DIP has an obligation to act not only in its own best interest, but rather in the best interest of the entire estate, including creditors.

48.    As a fiduciary, the DIP has a duty of loyalty.  In other words, the DIP is under an obligation to refrain from merely acting in his self-interest at the expense of his creditors, unless the transaction is inherently fair and manifests an arm's length bargain.

49.    The DIP also has a duty of care to the estate that includes, but is not limited to, protecting and maximizing the return on estate assets.  The DIP is obliged not to dissipate assets, either negligently or deliberately.

50.    Finally, the DIP has a duty to treat all creditors fairly.  A DIP may not take steps to retain its equity at the expense of creditors.

51.    Farley's conduct and his threats contravene the duties he owes to his estate and its creditors.  The most valuable asset including in Farley's Chapter 11 estate is, it is believed, his ownership interest in AGI.  Yet Farley is threatening to destroy the value of AGI rather than allow FXI or other creditors to see any of that value themselves.

52.    Moreover, the actions already taken by and/or threatened by Farley and AGI constitute a fraudulent conveyance of those assets of AGI and, through his ownership of all of the stock in AGI, of assets of the bankrupt estate.

53.    The actions of Farley and, under his direction, of AGI, violate their duties to the creditors of AGI in that they are actively taking steps to operate AGI in a manner so as to actively undercut and interfere with the interests of its creditors by, inter alia, threatening and planning to take steps to cease operations and transfer property of AGI, including valuable employment relationships and know-how and customer lists, to another company.

54.    AGI's conduct constitutes bad faith waste of is entire business, the purpose of which is to maliciously harm the interests of AGI's creditors, including but not limited to, FXI.

55.    For these reasons, FXI seeks (a) the appointment of a receiver, pursuant to section 105(a) of title 11 of the United States Code, over the assets of AGI; and (b) entry of a temporary restraining order and preliminary injunction enjoining AGI from (i) changing its name, business structure or identity, its principal place of business or chief executive office, or (ii) operating under

KAYE SCHOLER LLP

a new name or not continuing to conduct and operate its business substantially as presently conducted, operate and maintain and protect all franchises, permits, licenses, trademarks, trade names and contracts, preserve all the remainder of its material property used or useful in the conduct of its business, and keep the same in good repair and condition; (iii) acquiring all or substantially all of the properties or assets of any other person; (iv) selling or otherwise transferring or disposing of its assets; or (v) reclassifying its capital stock.

## COUNT I

## BREACH OF CONTRACT (FXI v. AGI)

56.    All of the foregoing paragraphs are incorporated herein by reference.

57.    AGI is in default of its obligations under the Amended Loan Agreement in that it has not made the payments required under it to FXI.

58.    Also, AGI is in breach, and/or is in anticipatory breach, of its obligations under the Amended Loan Agreement in that its senior management is threatening to cease to, conduct and operate its business substantially as they have been conducted, operate and maintain and protect all franchises, permits, licenses, trademarks, trade names, and contracts, and preserve all the remainder of its material property used or useful in the conduct of its business and keep the same in repair and condition.

59.    AGI is threatening to cease operations even if it means destroying the business, because its main goal under its current management is not to operate its business, but instead to serve the interests of Farley in his efforts to negotiate with its largest creditor, FXI.

60.    By this course of conduct AGI is causing irreparable harm to FXI in that is destroying the entire business of AGI.

## COUNT II

## BREACH OF GOOD FAITH AND FAIR DEALING (FXI v. AGI)

61.    All of the foregoing paragraphs are incorporated herein by reference.

62.    AGI has a duty of good faith and fair dealing.

KAYE SCHOLER LLP

63.   AGI is violating that covenant by embarking on a course of conduct that is designed expressly to deprive FXI of the benefits of the Amended Loan Agreement.

64.   By this course of conduct AGI is causing irreparable harm to FXI in that it is destroying the entire business of AGI.

## COUNT III

## BREACH OF FIDUCIARY DUTY TO CREDITORS AS OFFICER AND DIRECTOR OF INSOLVENT CORPORATION (FXI v. FARLEY)

65.   All of the foregoing paragraphs are incorporated herein by reference.

66.   AGI is insolvent and, as a result, Farley, as Chief Executive Officer and sole director, owes a fiduciary duty to its creditors, including but not limited to FXI, to act in their best interests rather than the best interests of its shareholder, Farley.

67.   AGI, however, through Farley, has openly threatened to transfer its valuable property to a third party, for no consideration or less than reasonably equivalent consideration, for the actual and avowed intent of hindering, delaying, and defrauding FXI. Such threat, if carried out, would constitute a fraudulent conveyance under the Uniform Fraudulent Transfer Act, California Civil Code §§ 3439-3439.12.

68.   Farley is breaching his fiduciary duty to FXI, by, among other things, causing AGI to make such threats.

69.   By this course of conduct AGI is causing irreparable harm to FXI in that it is destroying the entire business of AGI.

## COUNT IV

## BREACH OF FIDUCIARY DUTY TO CREDITORS AS DEBTOR-IN-POSSESSION (FXI v. FARLEY)

70.   All of the foregoing paragraphs are incorporated herein by reference.

71.   Farley is a Chapter 11 debtor-in-possession. As such, he too owes fiduciary duties of loyalty and care to the estate and to his creditors.

72.    Farley's conduct and his threats contravene the duties of loyalty and care which he owes to his estate and its creditors. The most valuable asset which constitutes property of Farley's Chapter 11 estate is, it is believed, his 100% ownership interest in AGI. Yet Farley is threatening to destroy the value of AGI rather than allow FXI or other creditors to derive any of that value themselves.

73.    By this course of conduct Farley is causing irreparable harm to FXI in that he is destroying the entire business of AGI.

## PRAYER FOR RELIEF

WHEREFORE, FXI requests that the Court enter an Order

(a)    Declaring that AGI is in default of its obligations to FXI under the Amended Loan Agreement and in breach of its obligation of good faith and fair dealing;

(b)    Declaring that Farley is in default of his fiduciary obligations to FXI;

(c)    Appointing a Receiver, pursuant to its equitable powers pursuant to section 105(a) of title 11 of the United States Code, with a charge to take control of the affairs of AGI for the purpose of:

(1)    insuring that AGI is not purposefully taking steps to disable itself from functioning or remaining in business and attempting to perform all of its obligations to all of its creditors including, but not limited, to FXI;

(2)    investigating the conduct of employees of the AGI company for the purpose of ensuring that no employees are acting in collusion to harm AGI or otherwise violating any duty to AGI under any employment contract and/or applicable law relating to trade secrets or intellectual property of AGI; and

(3)    such other relief that is just and appropriate.

(d)    enter an Order enjoining Farley and AGI from transferring any assets of AGI outside of the ordinary course of business without notice and a hearing in this Court, pursuant to its equitable powers under Bankruptcy Rule 7065 and/or Section 105(a) of the Bankruptcy Code; and

KAYE SCHOLER LLP

1         (e)    granting such other and further relief as is appropriate under all the

2  circumstances.

3

4  DATED: February 14, 2011        COZEN O'CONNOR

5                             -and-
                             KAYE SCHOLER LLP

6

7                           By:
                                Ashleigh A. Danker

8                           Attorneys for Plaintiff
                           FOAMEX INNOVATIONS OPERATING

9                           COMPANY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KAYE SCHOLER LLP

**EXHIBIT A**

## AMENDED AND RESTATED
## LOAN AND SECURITY AGREEMENT

THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of November 1ᴏ 2010, is entered into between ANATOMIC GLOBAL, INC., a California corporation, formerly known as Anatomic Concepts, Inc. ("Debtor"), on the one hand, and FOAMEX INNOVATIONS OPERATING COMPANY, a Delaware corporation ("FXI"), on the other hand.

### R E C I T A L S

A.     Debtor has previously executed and delivered the Note (as hereinafter defined), evidencing certain indebtedness of Debtor to FXI in connection with that certain Loan and Security Agreement dated as of May 18, 2010 (the "Prior Loan Agreement") between Debtor and FXI; and

B.     In connection with Debtor's obtaining a $2,500,000 revolving line of credit from Celtic Capital Corporation ("Celtic"), to be secured by a security interest in certain of the Collateral (as hereinafter defined) and the execution and delivery of the Subordination Agreement (as hereinafter defined) in connection therewith, Debtor has requested that the Prior Loan Agreement be modified by amending and restating the Prior Loan Agreement, as hereinafter set forth. FXI is willing to agree to such modifications on the terms and conditions hereinafter set forth, and subject among other things to the amendment of the Note as set forth in the First Note Amendment (hereinafter defined).

C.     Debtor's Obligations under the Note and Prior Loan Agreement are guaranteed by DAVID L. FARLEY, an individual ("Guarantor"), pursuant to that certain Continuing Guaranty dated as of May 18, 2010 ("Guaranty") from Guarantor in favor of FXI. As a condition of FXI's willingness to execute and deliver this Agreement, Guarantor will be required to execute and deliver to FXI the Pledge Agreement (as hereinafter defined), pledging all of Guarantor's capital stock in Debtor to secure his obligations under the Guaranty.

D.     The obligations of Debtor to FXI under this Agreement shall be secured by, among other things, a lien and security interest in and to all of Debtor's present and future assets, subject to Section 5.1(b).

NOW, THEREFORE, FXI and Debtor hereby agree that the Prior Loan Agreement is hereby amended and restated in its entirety as hereinafter set forth, and hereby further agree as follows:

### SECTION 1. Definitions

1.1     <u>Definitions</u>.

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an Account, chattel paper, or a General Intangible.

"Accounts" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as that term is defined in the Code), and any and all supporting obligations in respect thereof.

"Affiliate" means, as applied to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of stock, by contract or otherwise; provided, however, that, in any

6095820                                    1

event: (a) any Person which owns directly or indirectly 25% or more of the securities having ordinary voting power for the election of directors or other members of the governing body of a Person or 25% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed to control such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership or joint venture in which a Person is a partner or joint venturer shall be deemed to be an Affiliate of such Person.

"Agreement" is defined in the preamble.

"Books" means Debtor's now owned or hereafter acquired books and records, including, without limitation, all of its records indicating, summarizing or evidencing its assets, liabilities, business operations and financial condition.

"Business Day" means any day other than Saturday or Sunday on which FXI is open for business in Los Angeles, California.

"Code" means the California Uniform Commercial Code, as in effect from time to time.

"Collateral" means all of Debtor's now owned or hereafter acquired right, title, and interest in and to each of the following:

      (a)     Accounts,

      (b)     Books,

      (c)     Equipment,

      (d)     General Intangibles,

      (e)     Inventory,

      (f)     Investment Property,

      (g)     Negotiable Collateral,

      (h)     Money or other assets of Debtor that now or hereafter come into the possession, custody, or control of FXI, and

      (i)     The proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Equipment, General Intangibles, Inventory, Investment Property, Negotiable Collateral, money, deposit accounts, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"Debtor" is defined in the preamble.

"Debtor Documents" means, collectively, this Agreement, the Note, the Guaranty, the Pledge Agreement, the Subordination Agreement, all financing statements, and other documents and instruments and agreements executed and delivered from time to time in connection with the Loan and this Agreement, and all amendments, modifications, supplements, renewals, extensions and restatements thereof.

"Default" means any event or circumstance which, with the giving of notice or the passage of time (or both) would become an Event of Default.

Exh. A  0017

"Default Rate " means the per annum rate of interest equal to the interest rate under the Note plus 5.0%.

"Environmental Laws" means all environmental, land use, zoning, and chemical use statutes, ordinances, and codes of the United States of America, any state of the United States of America, and any locality thereof, relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to equipment, machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles), tools, parts, goods (other than consumer goods, farm products, or Inventory), wherever located, including all attachments, accessories, accessions, replacements, substitutions. additions, and improvements to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"Event of Default" is defined in Section 12.

"Extension of Credit" means the making of the Term Loan.

"First Note Amendment" means the First Amendment to Second Amended and Restated Note dated as of the date hereof, executed by Debtor and FXI.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time, applied on a consistent basis both as to classification of items and amounts.

"General Intangibles" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to general intangibles (including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, chooses or things in action, goodwill, patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, money, deposit accounts, insurance premium rebates, tax refunds, and tax return claims), and any and all supporting obligations in respect thereof, and any other personal property other than goods, Accounts, Investment Property, and Negotiable Collateral.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor" means David L. Farley, an individual.

"Guaranty" means that certain Continuing Guaranty dated as of May 18, 2010, duly executed by Guarantor, in form and content satisfactory to FXI in its sole opinion and judgment, unconditionally and irrevocably guaranteeing payment and performance of Debtor's obligations to FXI in connection with the Loan.

"Hazardous Materials" means, without limitation, any flammable explosive, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, hazardous or toxic substances or related materials as defined in the Compensation Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Section 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Inventory" means all of Debtor's now owned or hereafter acquired right, title and interest with respect to inventory, including goods held for sale or lease or to be furnished under a contract of service, goods that are leased by Debtor as lessor, goods that are furnished by Debtor under a contract of service, and raw materials, work in process, or materials used or consumed in Debtor's business.

"Investment Property" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to "investment property" as that term is defined in the Code, and any and all supporting obligations in respect thereof.

"Lien" means any lien, pledge, security interest, encumbrance or charge of any kind, including any conditional-sale or other title-retention arrangement and any similar preferential arrangement.

"Loan" means the aggregate principal amount of the Term Loan.

"Material Adverse Effect" means any change or changes or effect or effects that individually or in the aggregate are or are likely to be materially adverse to (i) the assets, business, operations, income, prospects or condition (financial or otherwise) of Debtor, taken as a whole, (ii) the Loan, (iii) the ability of Debtor to perform its obligations under any Debtor Document to which it is a party or (iv) the validity or enforceability of any of the Debtor Documents.

"Maturity Date" shall mean May 15, 2015, at which time the entire principal balance of the Loan, plus accrued interest thereon, is and shall be due and payable as provided in this Agreement and the Note, subject to acceleration as provided in the Debtor Documents.

"Negotiable Collateral" means all of Debtor's now owned and hereafter acquired right, title, and interest with respect to letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

"Note" means that certain Second Amended and Restated Promissory Note dated May 18, 2010 in the original principal sum of $4,539,937.32, executed by Debtor in favor of FXI in connection with the Loan.

"Obligations" means all present and future obligations (monetary or otherwise) of Debtor to FXI however and whenever arising, whether arising under or in connection with this Agreement, the Note and the other Debtor Documents or otherwise.

"Ordinary Course of Business" means, in respect of any transaction involving Debtor, the ordinary course of Debtor's business as conducted by Debtor in accordance with past practice and undertaken by Debtor in good faith and not for purposes of evading any covenant or restriction in any Debtor Document.

"Permitted Liens" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding has been commenced (including the filing of a Uniform Commercial Code financing statement, a notice of tax lien or a notice of judgment lien):

        (a)      Liens for taxes not yet due;

        (b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens arising in the Ordinary Course of Business that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

        (c)      pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by the Employee Retirement Income Security Act of 1974, as amended;

Exh. A  0019

(d)     deposits to secure the performance of bids, trade contracts and leases (other than for borrowed money or the equivalent), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount, and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person; and

(f)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 14(j).

"Person" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

"Pledge Agreement" means the Pledge Agreement dated as of the date hereof, executed by Guarantor in favor of FXI, pledging his right, title and interest in and to all capital stock in Debtor now or hereafter owned by Guarantor as security for the Obligations.

"Principal Balance" means the outstanding principal balance of the Note from time to time.

"Subordination Agreement" is defined in Section 22 hereof.

"Supply Agreement" means the Supply Agreement dated as of May 18, 2010, between Debtor and FXI, pertaining to the purchase of foam products by Debtor from FXI.

"Term Loan" is defined in Section 2.1.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of California.

1.2    <u>Accounting Terms</u>.  All accounting terms not specifically defined herein shall be constituted in accordance with GAAP.  When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3    <u>Code</u>.  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

1.4    <u>Construction</u>.  Unless the context of this Agreement or any other Debtor Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented buy the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Debtor Document refer to this Agreement or such other Debtor Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Debtor Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the other Debtor Documents to any agreement, instrument, or document shall include all alternations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto, and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in the other Debtor Documents shall be satisfied by the transmission of a Record and any Record transmitted shall

6095820               5

constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

     1.5    Schedules and Exhibits. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

     1.6    Recitals. The Recitals above are true and correct and are incorporated herein by this reference.

### SECTION 2. The Term Loan.

     2.1    Term Loan. FXI has heretofore provided a term loan to the Debtor on the date of this Agreement in the amount of Four Million Five Hundred Thirty-Nine Thousand Nine Hundred Thirty-Seven Dollars and Thirty-Two Cents ($4,539,937.32) ("Term Loan").

     (a)    Repayment Terms.

     (i)    Commencing on May 15, 2010, and on the fifteenth day of each calendar month thereafter through and including March 15, 2011, interest shall be due and payable in an initial monthly installment of $30,304.08, as may be modified from time to time by any change in the Note Rate (as described below).

     (ii)    Commencing on April 15, 2011, and on the 15th day of each calendar month thereafter until the Maturity Date, Debtor will pay a monthly installment of principal and interest in the amount specified for each due date as set forth in Schedule "A" to the Note as may be modified from time to time to reflect any change in the Note Rate (as defined herein).

     (iii)    On the Maturity Date, all outstanding principal and unpaid interest shall be due and payable.

     (iv)    The Debtor may prepay the Term Loan in full or in part at any time. The prepayment will be applied to the most remote installment of principal due under the Term Loan.

     (b)    Interest Rate. The Term Loan shall bear interest at the per annum rate of seven and a half percent (7.5%) plus the six month London Interbank Offered Rate ("LIBOR") rate as published in the Wall Street Journal on the last business day of the preceding month in which payment is due ("Note Rate"); provided, however, that interest shall accrue at the Note Rate commencing on May 15, 2010.

     (c)    Note. The Term Loan is evidenced by the Note. The obligations of Debtor to FXI under the Note is and will at all times continue to be secured by all of Debtor's assets.

     2.2    Application of Payments. All payments received by FXI from, or for the account of Debtor, due hereunder shall be applied by FXI, in its sole and absolute discretion, in the following manner, or in any other order or manner as FXI chooses:

     (a)    First. To pay any and all interest due, owing and accrued;

     (b)    Second. To pay any and all costs, advances, expenses or fees due, owing and, payable to FXI, or paid or incurred by FXI, arising from or out of this Agreement, the Note and any Debtor Documents;

     (c)    Third. Payment of the outstanding principal balance of the Note.

Exh. A  0021

All records of advances made under this Agreement and payments received by FXI shall be maintained at FXI's office, and the records of FXI shall, absent manifest error, constitute prima facie evidence of the matters reflected therein. The failure of FXI to record any advance, payment or expense shall not limit or otherwise affect any of the Obligations of Debtor to FXI.

## SECTION 3. Conditions Precedent

3.1     Conditions to Funding. The obligation of FXI to execute and deliver this Agreement, the First Note Amendment, the First Guaranty Amendment and the Subordination Agreement is subject to the fulfillment, to the satisfaction of FXI and its counsel, of each of the following conditions:

(a)     Debtor shall have executed and delivered to FXI the First Note Amendment.

(b)     Guarantor shall have executed and delivered to FXI the Pledge Agreement.

(c)     Debtor and Senior Creditor shall have executed and delivered to FXI the Subordination Agreement, in form and substance satisfactory to FXI.

(d)     The representations and warranties contained this Agreement and the other Debtor Documents shall be true and correct on and as of the date of this Agreement. Debtor shall have performed all material agreements on their part required to be performed under this Agreement and the other Debtor Documents on or prior to the date of this Agreement.

(e)     Since the delivery of Debtor's most recent financial statements, no change or changes or event or events shall have occurred which, in the opinion of FXI, constitutes or is likely to have a Material Adverse Effect.

(f)     All necessary consents, approvals and authorizations of, and declarations, registrations and filings with, governmental bodies and nongovernmental Persons required in order to consummate the Loan shall have been obtained or made and shall be in full force and effect.

(g)     There shall not be pending or, to the knowledge of Debtor, threatened, any action, suit, proceeding, governmental investigation or arbitration against or affecting Debtor or any of their respective assets or properties which FXI believes is likely to have a Material Adverse Effect. No order of any court, arbitrator or Governmental Authority shall be in effect which FXI believes constitutes or is likely to have a Material Adverse Effect.

(h)     If required by FXI, FXI shall have received true and correct copies of (i) the Articles of Incorporation of Debtor, certified as of a recent date by the Secretary of State of the State of formation of Debtor; (ii) the Bylaws of Debtor, as amended, certified by Debtor as being in full force and effect; and (iii) a current good standing certificate with respect to Debtor.

(i)     FXI shall have received certified resolutions of the shareholders or directors of Debtor with respect to this Agreement and the other Debtor Documents being executed and delivered on or about the date of this Agreement, together with a certificate identifying each such Person's incumbent officers and setting for the specimen signatures of such officers.

(j)     FXI shall have received such additional assignments, agreements, landlord waivers, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as FXI may request.

(k)     Debtor shall have made arrangements satisfactory to FXI for all delinquent amounts due and payable to FXI under the Supply Agreement (if any) to be paid on the date of execution and delivery of this Agreement from the proceeds of the initial advance to Debtor under the Senior Debt.

Exh. A  0022

**SECTION 4.**  [Intentionally omitted]

**SECTION 5.** Security Interest

5.1    Grant of Security Interest.

(a)    Debtor hereby grants to FXI a continuing security interest in all of its right, title, and interest in all currently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Debtor Documents and in order to secure prompt performance by Debtor of each of its covenants and duties under the Debtor Documents. The FXI's security interest in and to the Collateral shall attach to all Collateral without further act on the part of FXI or Debtor.  Except as otherwise provided in this Agreement or any other Debtor Document, Debtor has no authority, express or implied, to dispose of any item or portion of the Collateral.

(b)    Notwithstanding the foregoing, if the attachment of such security interest to any contract would require the consent of any party thereto other than Debtor or would give any such other party the right to terminate its obligations under such contract (notwithstanding the limitations of Uniform Commercial Code Sections 9-406 through 9-409), such contract shall (so long as such consent has not been obtained) be deemed not to be Collateral if (a) such other party has notified Debtor in writing that such other party intends to assert its rights under such contract that result from such attachment, and (b) Debtor has given Lender a copy of such notice and of such contract.

5.2    Negotiable Collateral.  In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that perfection of priority of FXI's security interest is dependent on or enhanced by possession, Debtor, immediately upon the request of FXI, shall endorse and deliver physical possession of such Negotiable Collateral to FXI.

5.3    Collection of Accounts, General Intangibles, and Negotiable Collateral.  At any time after the occurrence and during the continuation of an Event of Default, FXI or FXI's designee may (a) notify Account Debtors of Debtor that the Accounts, chattel paper, or General Intangibles have been assigned to FXI or that FXI has a security interest therein, or (b) collect the Accounts, chattel paper, or General Intangibles directly and charge the collection costs and expenses to the Loan Account. Debtor agrees that it will hold in trust for FXI, as FXI's trustee, any collections that it receives and immediately will deliver said collections to FXI in their original form as received by Debtor.

5.4    Authorization to File Financing Statements; Delivery of Additional Documentation Required.  Debtor authorizes FXI to file, from time to time, one or more financing statements with respect to the Collateral (including, without limitation, any financing statement that indicates the Collateral as "all assets" or "all personal property" of Debtor, or words to similar effect), and ratifies any action taken by FXI prior to the date hereof to effect or perfect a lien on any Collateral.  At any time upon the request of FXI, Debtor shall execute and deliver to FXI any and all financing statements, original financing statements in lieu of continuation statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, and all other documents (the "Additional Documents") that FXI may request in its sole discretion, in form and substance satisfactory to FXI, to perfect and continue perfected or better perfect FXI's security interest in the Collateral (whether now owned or hereafter arising or acquired), and in order to fully consummate all of the transactions contemplated hereby and under the other Debtor Documents. To the maximum extent permitted by applicable law, Debtor authorizes FXI to execute any such Additional Documents in Debtor's name and authorizes FXI to file such executed Additional Documents in any appropriate filing office. In addition, on such periodic basis as FXI shall require, Debtor shall (a) provide FXI with a report of all material new patentable, copyrightable, or trademarkable materials acquired or generated by Debtor during the prior period, (b) cause all material patents, copyrights, and trademarks acquired or generated by Debtor that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of Debtor's ownership thereof, and (c) cause to be

Exh. A  0023

prepared, executed, and delivered to FXI supplemental schedules to the applicable Debtor Documents to identify such material patents, copyrights, and trademarks as being subject to the security interests created thereunder.

   5.5   <u>Right to Inspect</u>.  FXI and its officers, employees, or agents shall have the right, from time to time hereafter to inspect the Books and to check, test, and appraise the Collateral in order to verify Debtor's financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral.

## SECTION 6. Intentionally omitted.

## SECTION 7. Power of Attorney.

   Debtor hereby irrevocably constitutes and appoints FXI and any agent or representative thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Debtor and in the name of Debtor or in its own name, from time to time in FXI's sole discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, hereby gives FXI the power and right, on behalf of Debtor, without notice to or assent by Debtor to do the following: (i) to ask, demand, collect, receive and give acquittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of Debtor or its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by FXI for the purpose of collecting any and all such moneys due under any Collateral whenever payable; (ii) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due thereunder, directly to FXI or as FXI shall direct; (iii) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; and (iv) generally to sell, transfer, pledge, make any agreement with respect or otherwise deal with any of the Collateral as fully and completely as though FXI were the absolute owner thereof for all purposes, and to do, at FXI's option and Debtor's expense, at any time, or from time to time, all acts and things which FXI reasonably deems necessary to protect, preserve or realize upon the Collateral and FXI's lien therein, in order to effect the intent of this Agreement, all as fully and effectively as Debtor might do. Debtor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Section 6 is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full. Notwithstanding the foregoing, FXI agrees not to exercise the power of attorney granted in this Section 7 except upon after occurrence and during the continuation of an Event of Default.

## SECTION 8. Representations and Warranties.

   Debtor hereby makes the following representations and warranties to FXI:

   (a)   Debtor is a corporation duly organized and existing under the laws of the State of California, duly qualified to do business in any state in which the nature of its business requires it to be so qualified and is lawfully empowered and has all requisite power and authority to own its assets and to carry on its business as now being conducted and as proposed to be conducted, and to execute, deliver and perform its obligations under this Agreement and the other Debtor Documents to which it is a party.

   (b)   The execution, delivery and performance by Debtor of the Debtor Documents to which it is a party are within its powers and have been duly authorized by all necessary action by or on behalf of Debtor. Each Debtor Document to which Debtor is a party has been duly executed and delivered by it and constitutes a legal, valid and binding obligations of Debtor, enforceable in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance

and other similar laws relating to or affecting creditors' rights generally, or the availability of equitable remedies.

(c)    The execution, delivery and performance by Debtor of the Debtor Documents to which it is a party (i) have been duly authorized by all requisite action; (ii) do not require governmental approval; (iii) will not result (with or without notice and/or the passage of time) in any conflict with or breach or violation of or default under, any provision of law, the articles of incorporation, bylaws, partnership agreement or other governing document of Debtor, any provision of any indenture, agreement or other instrument to which Debtor, or by which it or any of its properties or assets are bound; and (iv) will not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of Debtor, except as may be permitted by the Debtor Documents.

(d)    The financial statements of Debtor as provided to FXI in connection with Debtor's application for the Loan fairly present the financial condition of Debtor as of the date thereof.

(e)    There is not pending or, to the best of Debtor's knowledge, threatened, any litigation, proceeding or governmental investigation to which Debtor is a party and in which the claim or potential liability which could have a Material Adverse Effect or to which any of its assets is subject which could have a Material Adverse Effect.

(f)    The principal place of business of Debtor is located at 1241 Old Temescal Road, Corona, CA 92881. The Books of Debtor are located at such address.

(g)    Debtor is in possession of all material permits, licenses or other authorizations of governmental bodies required for the conduct of its business and the ownership of its properties (including all licenses and certificates of occupancy which are material to the ownership or operation of any real property) has been obtained and are usable by it, and its businesses is being conducted in accordance with the material requirements of such permits, licenses or other authorizations of governmental bodies subject to such exceptions as would not have, individually or in the aggregate, a Material Adverse Effect.

(h)    Debtor's property is free from contamination from Hazardous Materials (as defined in Section 10(h)) and each of them is in compliance with all applicable Environmental Laws (as defined in Section 10(h)) subject to such exceptions as would not have, individually or in the aggregate, a Material Adverse Effect.

(i)    Debtor is in compliance with all applicable laws and regulations with respect to employment and labor practices and employee benefits subject to such exceptions as would not have, individually or in the aggregate, a Material Adverse Effect.

(j)    Debtor has no subsidiaries.

(k)    Debtor has good and marketable title to all Collateral, free of all claims, liens, mortgages, pledges, security interests, encumbrances or charges of any kind. FXI's liens in the Collateral are validly created, perfected and constitute first priority liens on the Collateral.

(l)    Debtor does not maintain or contribute to any Defined Benefit Pension Plan under ERISA.

(m)    Debtor is solvent, able to pay its debts as they mature, and the realizable value of its assets exceed its liabilities.

(n)    All factual information (taken as a whole) furnished by or on behalf of Debtor in writing to FXI (including all information contained in the other Debtor Documents) for purposes of or in connection with this Agreement, the other Debtor Documents, or any transaction contemplated herein or

Exh. A  0025

therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of Debtor in writing to FXI will be, true and accurate, in all material respects, on the date as of which such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

(o)    Debtor does not use any trade names, trade styles or fictitious corporate names except as disclosed to FXI in writing.

(p)    Debtor is not in default under any indenture, mortgage, deed of trust, agreement or other instrument to which it is a party or by which it or its properties may be bound.  Neither the execution and delivery by Debtor of this Agreement or any of the instruments and documents to be delivered pursuant hereto or thereto, nor the consummation of the transactions herein or therein contemplated, nor compliance with the provisions hereof or thereof, will violate any law or regulation, or any order or decree of any court or governmental instrumentality in any respect, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement, or other instrument to which Debtor is a party or by which it or its properties may be bound.

(q)    Guarantor owns 100% of the issued and outstanding capital stock of Debtor.

## SECTION 9. Financial Reporting.

Debtor promises and agrees, during the term of this Agreement and until full payment of all Debtor's Obligations hereunder, to deliver or cause to be delivered to FXI in form and detail satisfactory to the FXI:

(a)    as soon as available, but in any event within sixty (60) days of the end of each fiscal year of Debtor and Guarantor, respectively, annual CPA-compiled financial statements of Debtor and Guarantor;

(b)    within fifteen (15) days of filing such returns, federal tax returns of Debtor and Guarantor, including all schedule K-1's; and

(c)    within twenty-one days of the end of each calendar month, monthly financial statements of Debtor, internally prepared by Debtor, in form and content satisfactory to FXI in its sole opinion and judgment.

## SECTION 10. Affirmative Covenants.

Until all Obligations are paid in full, Debtor covenants and agrees to do the following:

(a)    Perform or cause to be performed all Obligations secured hereby when due;

(b)    [RESERVED];

(c)    Debtor will not change its name, business structure or identity, its principal place of business or chief executive office, the location of Collateral or the place where Debtor keeps its records concerning the Collateral, or add any new fictitious name, without at least thirty (30) days prior written notice to FXI and without taking such steps as may be necessary to preserve and continue FXI's security interests prior to effecting such change, including the execution and delivery to FXI of any additional documents, instruments and agreements, including, without limitation, financing statements, waivers and subordinations, as FXI may request for such purpose;

(d)    Promptly inform FXI of the occurrence of any Default or Event of Default or of any event which could have a Materially Adverse Effect upon Debtor's business, properties, financial

Exh. A  0026

condition or ability to comply with its Obligations to FXI, including without limitation its ability to pay the Obligations;

      (e)     Furnish such other information and reports regarding Debtor as FXI may reasonably request, including, without limitation, current financial statements;

      (f)     Keep in full force and effect its existence in good standing, continue to conduct and operate its business substantially as presently conducted and operated and maintain and protect all franchises, permits, licenses, trademarks, trade names and contracts and preserve all the remainder of its material property used or useful in the conduct of its business and keep the same in good repair and condition;

      (g)     Maintain a standard and modern system of accounting in accordance with GAAP consistently applied with ledger and account cards and/or computer tapes and computer disks, computer printouts and computer records pertaining to the Collateral which contain information as may from time to time be requested by FXI, not modify or change its method of accounting without the written consent of FXI first obtained. Debtor will permit FXI and any of its employees, officers, or agents, upon demand, during Debtor's usual business hours, or the usual business hours of any third person having control thereof, to have access to and examine all of Debtor's records relating to the Collateral, Debtor's financial condition and the results of Debtor's operations and in connection therewith and permit FXI or any of its agents, employees, or officer to copy and make extracts therefrom, should FXI determine in its sole discretion that there are changes in Debtor's financial condition that may indicate a deterioration;

      (h)     [RESERVED];

      (i)     At Debtor's own cost and expense in amounts and with carrier acceptable to FXI, Debtor shall (i) keep all it insurable properties and properties in which Debtor has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Debtor's including, without limitation; business interruption insurance; (ii) maintain a bond in such amounts as is customary in the case of companies engaged in business similar to Debtor's insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Debtor either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such workers' compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Debtor is engaged in business; (v) furnish FXI with (A) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (B) appropriate loss payable endorsements in form and substance satisfactory to FXI, naming FXI as loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (i) and (ii) above, and providing (1) that all proceeds thereunder shall be payable to FXI, (2) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (3) that such policy and loss payable clauses may not be canceled, amended or terminated unless at least thirty (30) days' prior written notice is given to FXI. In the event of any loss thereunder, the carriers named therein hereby are directed by FXI and Debtor to make payment for such loss to FXI and not to Debtor and FXI jointly. If any insurance losses are paid by check draft or other instrument payable to Debtor and FXI jointly, FXI may endorse Debtor's name thereon and do such other things as FXI may deem advisable to reduce the same to cash. FXI is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (i) and (ii) above. All loss recoveries received by FXI upon any such insurance may be applied to the Obligations, in such order as FXI in its reasonable discretion shall determine. Any surplus shall be paid by FXI to Debtor or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Debtor to FXI on demand. If Debtor fails to obtain insurance as hereinabove provided, or to keep the same in force, FXI, if FXI so elects and upon notice to Debtor, may obtain such insurance and pay the premium therefor for Debtor's account, and charge Debtor's account therefor and such expenses so paid shall be part of the Obligation;

6095820

12

Exh. A  0027

(j)     Debtor will not possess or cause to be located any Hazardous Materials on, in or under any real or personal property now or at any time hereafter owned, occupied or operated by Debtor which in any manner violate any Environmental Law;

(k)     Debtor will confine its business operations to the businesses engaged in on the date hereof and comply with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations or otherwise presently in effect and having application to the Debtor and its business;

(l)     Debtor shall notify FXI within 10 days of service upon the Debtor or the filing by the Debtor of any legal action involving a claim in excess of $100,000.00;

(m)     Debtor will not consolidate or merge with or into any other entity or permit any other entity to consolidate or merge with or into Debtor;

(n)     Permit FXI and its designees at any time to exercise its rights hereunder;

(o)     Permit FXI and its designees at any time during normal business hours or upon twenty-four (24) hours' prior notice to inspect the Collateral; to have free access and right of inspection to any papers, instruments and records pertaining thereto; and make photocopies, at Debtor's expense, from Debtor's books and records pertaining to the Collateral;

(p)     Promptly notify FXI in writing of the details of any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or that would result in any material adverse change in Debtor's business, properties, assets, goodwill or condition, financial or otherwise;

(q)     Pay before delinquency all charges, liens, taxes, assessments and insurance premiums charged against the Collateral, and upon the failure of Debtor to do so, FXI may, at its option, pay any such charge, the amount of which shall be added to the Obligations and bear interest at the rate provided in the note, agreement or other instrument evidencing the underlying obligation;

(r)     Preserve and protect all Collateral and at all times maintain the Collateral in good condition and repair, ordinary wear and tear excepted, not causing or permitting any waste or unusual or unreasonable depreciation;

(s)     Register, use, operate and control the Collateral in accordance with all relevant statutes, laws, ordinances and regulations;

(t)     Furnish FXI with reports on all acquisitions, returns, sales or other dispositions of Collateral consisting of inventory in such form and detail and at such time as FXI may from time to time require;

(u)     Provide any service and do any acts or things necessary to keep the Collateral free and clear of all defenses, rights of offset and counterclaims, other than Permitted Liens;

(v)     If all or any part of the Collateral is or is about to become affixed to realty, Debtor shall, at FXI's request, furnish FXI with a writing executed by the owner and mortgagee of the realty whereby the owner and mortgagee subordinates its rights and priorities to FXI's interest in the Collateral. If the Collateral is or may become subject to a landlord's lien, Debtor shall, at FXI's request, furnish FXI with a landlord's waiver satisfactory in form and substance to FXI in its sole opinion and judgment;

(w)     Pay all costs and expenses, including attorneys' fees incurred by FXI and relating to the perfection, preservation, realization, enforcement and exercise of FXI's rights, remedies and powers hereunder; and

Exh. A  0028

(x)      Execute such documents, including, without limitation, financing statements, fixture filings, assignments, and endorsements of certificates of title, and do such things as FXI may reasonably request for the purpose of perfecting, preserving and enforcing its security interest in the Collateral and to consummate all of the transactions contemplated by this Agreement or any other agreement between FXI and Debtor.

## SECTION 11. Additional Covenants.

Unless otherwise excepted by this Agreement or by written amendment executed by FXI, Debtor agrees with respect to all Collateral consisting of Accounts, General Intangibles, instruments, documents (collectively, "Rights to Payment") and the proceeds thereof:

(i)  if requested by FXI during the continuation of an Event of Default, to receive and use reasonable diligence to collect, in trust and as the property of FXI, its Rights to Payment and the proceeds thereof and to immediately endorse as appropriate and deliver such Collateral to FXI daily in the exact form in which they are received together with a collection report in form satisfactory to FXI;

(ii)  if requested by FXI, not to commingle Rights to Payment or collections thereunder with other property;

(iii)  to give only normal allowances and credits and to advise FXI thereof immediately in writing if they affect Rights to Payment;

(iv)  on demand during the continuation of an Event of Default, to deliver to FXI returned property resulting from, or payment equal to such allowances or credits on Rights to Payment or to execute such documents and perform such acts as FXI may reasonably request for the purpose of perfecting, preserving and enforcing FXI's security interest in such returned property;

(v)  from time to time when requested by FXI, to prepare and deliver a schedule of all Rights of Payment and the proceeds thereof and, during the continuation of an Event of Default, to assign in writing and deliver to FXI all Rights to Payment; and

(vi)  in the event FXI elects to receive payments under the Rights to Payment or the proceeds of any Collateral hereunder, to pay all expenses incurred by FXI in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording, record keeping and expenses incidental thereto.

## SECTION 12. Negative Covenants.

Debtor shall not do any of the following:

(a)      Except for Permitted Liens, grant a security interest in or permit a lien, claim or encumbrance upon any of its assets to any Person other than FXI (unless approved, including without limitation as to the amount of the obligations secured thereby, in writing in advance by FXI);

(b)      Permit any levy, attachment or restraint to be made affecting any of its assets;

(c)      Permit any judicial officer or assignee to be appointed or to take possession of any of the assets of Debtor;

(d)      [RESERVED];

(e)      Move or relocate any Collateral except in the Ordinary Course of Business, and in any case only to the extent that FXI's security interest is unimpaired;

Exh. A  0029

(f)    Acquire any other Person;

(g)    Enter into any transaction not in the Ordinary Course of Business;

(h)    Make any change in its business objects, purposes or operations;

(i)    Incur any indebtedness for borrowed money other than (i) the Obligations, (ii) the Senior Debt subject to the Subordination Agreement, (iii) trade payables incurred in the Ordinary Course of Business, and (iv) indebtedness secured by Permitted Liens;

(j)    Make loans, advances, distributions, dividends or extensions of credit to any Person, including, but not limited to, directors, officers, shareholders, partners, employees and any and all Affiliates except for (i) credit extended in the Ordinary Course of Business as conducted by Debtor in accordance with past practices and undertaken by Debtor in good faith and not for the purposes of evading the intent of this covenant or any other covenant or restriction of the Loan, and (ii) payment of shareholder taxes, which shall not exceed the combined maximum income tax rates of the State of California and the United States of America;

(k)    Guaranty or otherwise, directly or indirectly, in any way be or become responsible for obligations of any other Person, whether by agreement to purchase the indebtedness of any other Person, agreement for the furnishing of funds to any other Person through the furnishing of goods, supplies or services, by way of stock purchase, capital contribution, advance or loan, for the purpose of paying and discharging (or causing the payment or discharge of) the indebtedness of any other Person, or otherwise, except for the endorsement of negotiable instruments in the Ordinary Course of Business for deposit or collection;

(l)    Sell, lease, transfer or otherwise dispose of any assets, except for the sale of the inventory in the Ordinary Course of Business, acquire all or substantially all of the properties or assets of any other Person, enter into any reorganization or recapitalization, reclassify its capital stock, or enter into any sale-lease back transaction; provided, however, that Debtor may sell or otherwise dispose of assets that have become worn-out or obsolete, and may terminate, surrender or sublease a lease in the Ordinary Course of Business;

(m)    Purchase or hold beneficially any stock or other securities of, or make any investment or acquire any interest whatsoever in, any other Person, except for certificates of deposit with maturities of one year or less of a United States commercial bank with capital, surplus and undivided profits in excess of five hundred million dollars ($500,000,000), direct obligations of the United States government maturing within one (1) year from the date of acquisition thereof, and commercial paper maturing within 180 days after the issuance thereof which is rated A-1 or better by Standard & Poor's Corporation or B-1 or better by Moody's Investors Service, Inc.;

(n)    Except as otherwise expressly permitted herein, make investments or capital contributions in or to, any other Person without the prior written consent of FXI; and

(o)    Allow any fact, condition or event to occur or exist with respect to any employee, pension or profit sharing plan established or maintained by it which might constitute grounds for termination of any such plan or for the court appointment of a trustee to administer any such plan.

(p)    Sell, contract for sale, transfer, convey, assign, lease or sublet any asset in the Ordinary Course of Business which violates any provision of law, rule, regulation, order, writ, judgment, induction, decree, determination or otherwise presently in effect and having application to Debtor.

(q)    Change management or ownership of Debtor without the prior written consent of the FXI.

Exh. A  0030

**SECTION 13.** Powers of FXI and Authorizations.

Debtor hereby authorizes FXI and its designees at any time and whether or not an Event of Default exists:

(a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise and to make such payments and perform such acts as FXI may deem necessary to preserve and insure the Collateral or its value of FXI's security interest, including, without limitation, any action which Debtor shall have agreed to take pursuant to the terms of this Agreement;

(b) to give notice of FXI's interest in the portion of the Collateral consisting of inventory and request from bailees of the inventory at any time, in the name of Debtor or FXI or any designee of FXI, information concerning the Collateral and any amount owing with respect thereto;

(c) to enter Debtor's premises for the purpose of inspecting, verifying, auditing, maintaining, preserving, protecting and removing the Collateral; and

(d) to assign its rights in this Agreement in full (but not in part) (1) at any time after March 15, 2011, or (2) at any time following the occurrence and during the continuation of an Event of Default, in each case subject to the further provisions of Section 24 hereof.

Debtor hereby further authorizes FXI at any time when an Event of Default exists hereunder:

(i) to give notice of FXI's interest in the Collateral and request from account debtors or bailees of the Collateral at any time, in the name of Debtor or FXI or any designee of FXI, information concerning the Collateral and any amount owing with respect thereto;

(ii) to deliver all or part of the Collateral to Debtor at any time and any such transfer or delivery shall discharge FXI from all liability with respect to the Collateral so transferred or delivered.

(iii) to receive, open and read mail addressed to Debtor;

(iv) to notify account debtors to make payment directly to FXI;

(v) to take or bring, in the name of FXI or Debtor, all steps, actions, suits or proceedings deemed by FXI necessary or desirable to effect collection of the Collateral;

(vi) to prepare, adjust, execute, deliver and receive payment under insurance policies on the Collateral and any claims thereunder, and to apply such amounts received by FXI, at FXI's sole option, toward repayment of the Obligations or replacement of the Collateral;

(vii) to enter into any agreement, compromise or settlement relating to or affecting any Collateral, whether pledged pursuant to this Agreement or any other agreement, including, without limitation, any agreement to deposit or surrender control of all or any part of the Collateral, or accept other property in exchange for the Collateral which may be either applied to the obligations or held by the FXI pursuant to this Agreement; and

(viii) to place FXI's representative on the premises of Debtor to enforce this Agreement or appoint a receiver to enforce this Agreement.

The authority granted to FXI under this Agreement may be exercised by FXI at its option, shall not in any way affect or decrease the liability of Debtor to FXI, and shall remain in full force and effect until termination of this Agreement. Debtor hereby releases FXI, its officers, employees and designees from any liability arising from any act or acts made in good faith under such power-of-attorney,

Exh. A  0031

authorizations, or otherwise under this Agreement, whether by omission or commission, and whether based upon any error of judgment or mistake of law or fact.

## SECTION 14.Events of Default.

An "Event of Default" shall mean, for all purposes under the Debtor Documents, any one or more of the following:

(a)    If Debtor (i) fails to pay all or any portion of the Obligations constituting principal or interest when due (whether as scheduled, by acceleration or otherwise), (ii) fails to pay when due all or any portion of the Obligations constituting a payment under the Supply Agreement, and such failure is not cured within any applicable notice and cure periods, if any, contained in the Supply Agreement, or (iii) fails to pay all or any portion of the other Obligations (whether of taxes, reimbursement of FXI expenses or otherwise) within five (5) Business Days after the due date thereof;

(b)    If any representation, statement, report or certificate made or delivered by Guarantor, or by Debtor or any of its officers, employees or agents, to FXI is not true and correct in any material respect when made or delivered;

(c)    If Debtor fails or neglects to perform, keep or observe any covenant or agreement contained in Section 10(c), 10(d), 10(e), 10(i), 10(l), 12(a) or 12(e) of this Agreement;

(d)    If Debtor fails or neglects to perform, keep or observe any covenant or agreement contained in this Agreement, in any other Debtor Document or any other present or future agreement between Debtor and FXI not otherwise specifically constituting an Event of Default under this Section 14 and such failure is not cured within ten (10) days after the earlier of (i) receipt by Debtor of written notice from FXI of the existence of such failure or neglect or (ii) the date Debtor first knows of such failure; provided, however, if such failure is incapable of cure, Debtor shall not be entitled to any notice or grace hereunder; and, provided, further, that if such failure is curable but not within such ten (10) day period, then such failure or neglect shall not constitute an Event of Default so long as Debtor shall have commenced all commercially reasonable curative actions within such ten (10) day period and shall diligently pursue such actions to completion;

(e)    If all or any of the assets of Debtor become subject to a writ or distress warrant, or are levied upon, or come into the possession of any judicial officer or assignee and the same are not released, discharged or bonded against within ten (10) days;

(f)    If any bankruptcy, insolvency, receivership or other proceeding is filed or commenced by or against Debtor for its reorganization, dissolution or liquidation;

(g)    If Debtor is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

(h)    If Debtor for whatever reason is unable to conduct its Ordinary Course of Business for a period of fourteen (14) consecutive Business Days;

(i)    If a notice of lien, levy or assessment is filed of record with respect to any or all of the assets of Debtor by any Governmental Authority, or if any taxes or debts owing at any time hereafter to any one or more of such entities becomes a lien, whether choate or otherwise, upon any or all of Debtor's assets and the same is not paid on the payment date thereof, unless the same is being contested in good faith by appropriate proceedings, execution is stayed during such proceedings and Debtor has taken appropriate reserves therefore in accordance with GAAP;

(j)    If a final judgment for the payment of money in excess of Twenty-five Thousand Dollars ($25,000.00) is entered by a court against Debtor which, within ten (10) days after such

Exh. A  0032

entry, shall not have been discharged or execution thereof stayed pending appeal or shall not have been discharged within five (5) days after the expiration of any such stay;

      (k)    If Debtor permits a default in any material agreement to which it is a party with third parties so as to result in an acceleration of the maturity of Debtor's indebtedness to others in an amount greater than $50,000, whether under any indenture, agreement or otherwise;

      (l)    If Debtor makes any payment on account of indebtedness which has been subordinated to its obligations to FXI;

      (m)    If Guarantor fails to perform any term, condition or agreement contained in the Guaranty, which failure is not cured within ten (10) days, or notifies FXI of an intention to revoke the Guaranty;

      (n)    If Debtor fails to pay any payroll tax obligation when due;

      (o)    If David L. Farley fails to maintain a full-time working schedule (excluding normal vacations and holidays) in furtherance of the business affairs of Debtor for any period of thirty (30) days or ceases to be employed by Debtor; or

      (p)    If Senior Creditor (as defined in Section 22) (1) exercises its right under the agreements evidencing the Senior Debt (as defined in Section 22) to cease funding requests by Debtor for advances under the Senior Debt (each, a "Senior Debt Funding Stoppage") due to the occurrence of an adverse change in the financial condition or operations of Debtor that, in the judgment of Senior Creditor, results in a material impairment of the prospect of repayment of the Senior Debt, or any similar "material adverse change" funding condition, and (2) such Senior Debt Funding Stoppage shall continue for more than thirty (30) consecutive days.  For purposes of this paragraph, the funding by Senior Creditor of any such advance within thirty (30) days after the commencement of any Senior Debt Funding Stoppage shall constitute the termination of such Senior Debt Funding Stoppage.

## SECTION 15. FXI's Rights and Remedies.

    15.1    <u>Rights and Remedies</u>.  Upon the occurrence, and during the continuation, of an Event of Default, FXI (at its election but without notice of its election and without demand) may do any one or more of the following, all of which are authorized by Debtor:

      (a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Debtor Documents, or otherwise, immediately due and payable;

      (b)    Cease advancing money or extending credit to or for the benefit of Debtor under this Agreement, under any of the Debtor Documents, or under any other agreement between Debtor and FXI;

      (c)    Terminate this Agreement and any of the other Debtor Documents as to any future liability or obligation of FXI, but without affecting any of the FXI's liens in the Collateral and without affecting the Obligations;

      (d)    Settle or adjust disputes and claims directly with Account Debtors for amounts and upon terms which FXI considers advisable, and in such cases, FXI will credit the Obligations with only the net amounts received by FXI in payment of such disputed Accounts after deducting all of FXI's fees and costs, including attorney's fees, incurred or expended in connection therewith;

      (e)    Cause Debtor to hold all returned Inventory in trust for FXI, segregate all returned Inventory from all other assets of Debtor or in Debtor's possession and conspicuously label said returned Inventory as the property of FXI;

Exh. A  0033

(f)     Without notice to or demand upon Debtor, make such payments and do such acts as FXI considers necessary or reasonable to protect its security interests in the Collateral. Debtor agrees to assemble the Collateral if FXI so requires, and to make the Collateral available to FXI at a place that FXI may designate. Debtor authorizes FXI to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any lien that in FXI's determination appears to conflict with FXI's security interests in the Collateral and to pay all expenses incurred in connection therewith and to charge Debtor therefor. With respect to any of Debtor's owned or leased premises, Debtor hereby grants FXI a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of FXI's rights or remedies provided herein, at law, in equity, or otherwise;

(g)     Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any Collateral in satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of Debtor held by FXI, or (ii) indebtedness at any time owing to or for the credit or the account of Debtor held by FXI;

(h)     Hold, as cash collateral, any and all balances and deposits of Debtor held by FXI to secure the full and final repayment of all of the Obligations;

(i)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Debtor hereby grants to FXI a license or other right to use, without charge, Debtor's labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and Debtor's rights under all licenses and all franchise agreements shall inure to FXI's benefit;

(j)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as FXI determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(k)     FXI shall give notice of the disposition of the Collateral as follows:

(i)     FXI shall give Debtor a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, then the time on or after which the private sale or other disposition is to be made; and

(ii)     The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in Section 14, at least 10 days before the earliest time of disposition set forth in the notice; no notice needs to be given prior to the disposition of any portion of the Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market;

(1)     FXI may credit bid and purchase at any public sale;

(l)     FXI may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing;

(m)     FXI shall have all other rights and remedies available at law or in equity or pursuant to any other Debtor Document; and

(n)     Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Debtor. Any excess will be returned, without interest and subject to the rights of third Persons, by FXI to Debtor.

Exh. A  0034

15.2   <u>Remedies Cumulative</u>. The rights and remedies of FXI under this Agreement, the other Debtor Documents, and all other agreements shall be cumulative. FXI shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by FXI of one right or remedy shall be deemed an election, and no waiver by FXI of any Event of Default shall be deemed a continuing waiver. No delay by FXI shall constitute a waiver, election, or acquiescence by it.

**SECTION 16.** Survival of Covenants, Agreements, Representations and Warranties.

All covenants, agreements, representations and warranties (a) previously made (except as specifically subsequently modified); (b) made in connection herewith or with the Note and/or the Debtor Documents and/or any document contemplated hereby; or (c) executed hereafter (unless such document expressly states that this Agreement does not apply thereto) shall survive the borrowing hereunder and thereunder and the repayment in full of the Note and/or the Debtor Documents and any amendments, renewals or extensions thereof and shall be deemed to have been relied upon by FXI. All statements contained in any certificate or other document delivered to FXI at any time by or on behalf of Debtor shall constitute representations and warranties by Debtor.

**SECTION 17.** Notices.

All communications provided for hereunder shall be in writing and delivered by hand or sent by registered or certified mail or sent by facsimile (with such facsimile to be confirmed promptly in writing sent by first class mail), sent (i) if to FXI, to:

FOAMEX INNOVATIONS OPERATING COMPANY
Rose Tree Corporate Center II
Media, Pennsylvania 19063-2076
Attention: Treasurer
Facsimile No. (610) 744-2395

or to such other address or facsimile number as FXI may have designated to Debtor in writing; and (ii) if to Debtor, to:

ANATOMIC GLOBAL, INC.
1241 Old Temescal Road
Corona, California 92881
Attention: David L. Farley, President
Facsimile No. (951) 371-3770

or to such other address or addresses or facsimile number or numbers as Debtor may most recently have designated in writing to FXI by such notice. All such communications shall be deemed to have been given or made when so delivered by hand or sent by or facsimile, or three Business Days after being so mailed.

**SECTION 18.** Miscellaneous.

The parties agree to the following miscellaneous terms:

(a)   This Agreement and the other Debtor Documents shall be governed by California law, without regard for the effect of conflict of laws;

(b)   Debtor agrees that it will pay all out of pocket costs and expenses of FXI and expenses (including, without limitation, FXI's reasonable attorneys' fees and costs and/or fees, transfer charges and costs of FXI's in-house counsel) in connection with the preparation and of this Agreement and the other Debtor Documents, and waiver, amendment or modification of any thereof, and the enforcement

6095820

20

Exh. A  0035

by FXI of any of its rights and remedies hereunder and thereunder, including, but not limited to, any and all appeals and any bankruptcy or other insolvency proceeding and whether or not suit is filed ;

(c)    This Agreement and the other Debtor Documents shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that Debtor shall not assign or transfer its right or obligations under this Agreement and/or the other Debtor Documents without the prior written consent of FXI;

(d)    Debtor acknowledges that FXI may provide information regarding Debtor and the Loan to FXI's affiliates and service providers, subject to the provisions of Section 22 hereof;

(e)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement;

(f)    Any provision of this Agreement or any other Debtor Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or such Debtor Document or affecting the validity or enforceability of such provision in any other jurisdiction;

(g)    FXI reserves the right to sell the Loan as and to the extent permitted under Section 13(d) hereof, and/or to sell a participation interest and/or interests in the Loan. FXI also reserves the right to pledge the Loan and the Debtor Documents to FXI's revolving lender. Debtor agrees that any information, financial statements and documents furnished to FXI may be furnished by FXI to any prospective participant or purchaser. Upon request by FXI, Debtor shall promptly deliver to any respective purchaser for said Loan and/or a participation interest in said Loan a written statement confirming the outstanding principal balance of said Loan and the non-existence of any uncured default by FXI and/or Debtor under any Debtor Documents, which statement shall be accompanied by current financial statements of Debtor; and

(h)    This Agreement is an integrated agreement and supersedes all prior negotiations and agreements regarding the subject matter hereof. Any amendments hereto shall be in writing and be signed by all parties hereto.

(i)    FXI's consent to or approval of any act by Debtor requiring further consent or approval shall not be deemed to waive or render unnecessary FXI's consent to or approval of any subsequent act. FXI's acceptance of a late performance of any obligation shall not constitute a waiver by FXI of the right to require prompt performance of all further obligations, FXI's acceptance of any performance following the sending or filing of any notice of default shall not constitute a waiver of FXI's right to proceed with the exercise of its remedies for any unfulfilled obligations; and FXI's acceptance of any partial performance shall not constitute a waiver by FXI of any rights relating to the unfulfilled portion of the applicable obligation.

(j)    The provisions hereof shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, administrators, executors, successors, and assignees; PROVIDED, HOWEVER, that this Agreement shall be personal to Debtor and no assignment by Debtor of any of its rights under this Agreement is permitted and no such assignment shall be binding upon FXI or of any effect unless the prior written consent of FXI to such assignment has first been procured.

(k)    If Debtor shall fail to perform any obligation hereunder that requires the payment of money, FXI may perform such obligation without notice to Debtor, and any sums expended by FXI pursuant to this subsection shall be deemed to be disbursements under the Note and shall bear interest until repaid at the Default Rate.

Exh. A  0036

(l)  The terms of this Agreement and the Debtor Documents supersede any inconsistent terms of FXI's loan commitment to Debtor, if any; provided, that all obligations of Debtor under the commitment to pay any fees to FXI or any costs and expenses relating to the Loan or the commitment shall survive the execution and delivery of this Agreement, and the Debtor Documents. The terms of this Agreement supersede any inconsistent terms of any of the Debtor Documents.

(m)  If there is an Event of Default, and if reasonably required by FXI, FXI may hire such third-party consultants as it deems reasonably necessary, the costs of which shall be paid by Debtor.

(n)  This Agreement is made for the sole protection and benefit of FXI and Debtor and their successors and assigns. No trust fund is created by this Agreement and no other persons or entities will have any right of action under this Agreement or any right to the funds under the Debtor Documents.

(o)  Nothing herein shall be construed to constitute FXI and Debtor a partnership or joint venture, or FXI an agent of Debtor, it being agreed that the sole relationship between FXI and Debtor shall be that of FXI and Debtor.

(p)  All cure periods provided for herein or in the Debtor Documents, shall run concurrently with any statutory cure periods.

(q)  WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS

Exh. A  0037

CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE
EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

### SECTION 19. Indemnity; Waivers.

19.1    <u>Demand; Protest</u>. Debtor waives demand, protest, notice of protest, notice of default or
dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement,
extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by FXI on
which Debtor may in any way be liable.

19.2    <u>FXI's Liability for Collateral</u>. Debtor hereby agrees that: (a) FXI shall not in any way or
manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto
occurring or arising in any manner or fashion from any cause, other than as a result of FXI's gross
negligence or willful misconduct, as found in a final, non-appealable judgment by a court of competent
jurisdiction, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier,
warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction
of the Collateral shall be borne by Debtor.

19.3    <u>Indemnification</u>. Debtor shall pay, indemnify, defend, and hold the FXI and each of its
respective officers, directors, employees, agents, and attorneys-in-fact (each, an "Indemnified Person")
harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits,
actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and
other costs and expenses actually incurred in connection therewith (as and when they are incurred and
irrespective of whether the suit is brought), at any time asserted against, imposed upon, or incurred by any of
them (a) in connection with or as a result of or related to the execution, delivery, enforcement,
performance, or administration of this Agreement, any of the other Debtor Documents, or the transactions
contemplated hereby or thereby, and (b) with respect to any investigation, litigation, or proceeding related
to this Agreement, any other Debtor Document, or the use of the proceeds of the credit provided hereunder
(irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or
circumstance in. any manner related thereto (all the foregoing, collectively, the "Indemnified Liabilities")
provided, however, that in no event shall Debtor be obligated to indemnify, defend or hold any Indemnified
Party harmless from or against any such claims, demands, suits, actions, investigations, proceedings, and
damages, attorneys fees or disbursements, or other costs or expenses, arising from the gross negligence or
willful misconduct of such Indemnified Party, as found in a final, non-appealable judgment by a court of
competent jurisdiction.

This provision shall survive the termination of this Agreement and the repayment of the
Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to
an Indemnified Liability as to which Debtor was required to indemnify the Indemnified Person receiving
such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed
by Debtor with respect thereto.

### SECTION 20. USA Patriot Act Notice.

Federal law requires all financial institutions to obtain, verify and record information that
identifies each person who opens an account or obtains a loan. The FXI will ask for the Debtor's legal
name, address, tax ID number or social security number and other identifying information. The FXI may
also ask for additional information or documentation or take other actions reasonably necessary to verify
the identity of the Debtor, guarantors or other related persons.

### SECTION 21. Amendment and Restatement; No Novation.

This Agreement supersedes and fully amends and restates in its entirety the terms of the Prior
Loan Agreement. The Obligations outstanding under the Prior Loan Agreement immediately prior to the

effectiveness of this Agreement are not extinguished, but are deemed continued under and evidenced by this Agreement and the Note, and continue to be secured hereby and by the Pledge Agreement.

### SECTION 22. Subordination Agreement.

This Agreement is subject in all respects to the provisions of that certain Debt and Lien Subordination Agreement dated as of the date hereof (the "Subordination Agreement"), by and among Debtor, FXI and Senior Creditor. "Senior Creditor" means Celtic Capital Corporation, as the initial holder of the Senior Debt (as defined in the Subordination Agreement), and its successors and permitted assigns, and the holder of any Permitted Senior Debt Refinancing (as defined in the Subordination Agreement) and such holder's successors and permitted assigns.

### SECTION 23. Confidentiality.

FXI agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to FXI's and its affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of the Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to the Debtor Documents or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 23, to any assignee of or participant in, or any prospective assignee of or participant in, any of FXI's rights or obligations under this Agreement, (g) with the consent of the Debtor (or of Guarantor in the case of Information personal to Guarantor rather than Debtor), (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 23 or (ii) becomes available to FXI on a nonconfidential basis from a source other than Debtor or Guarantor, and (i) to any investor in or lender to FXI (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of the Information and instructed to keep such Information confidential). For purposes of this Section 23, "Information" means all information received from Debtor and Guarantor, or either of them, relating to it or its business or finances, other than any such information that is available to FXI on a nonconfidential basis before disclosure by Debtor or Guarantor; provided, however, that, in the case of information received from Debtor or Guarantor after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 23 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

### SECTION 24. Certain Provisions relating to the Supply Agreement.

Notwithstanding anything to the contrary contained herein or in the Supply Agreement, in the event FXI sells or assigns the Loan and its interest in the Note and this Agreement (other than the pledge thereof to FXI's revolving lender), all references to the Supply Agreement and Debtor's obligations in respect of the Supply Agreement that are contained in this Agreement, in the Note or in any other documents, instruments or agreements evidencing, guaranteeing or securing the Obligations hereunder (whether directly or indirectly) shall automatically be deemed eliminated for all purposes from and as of the effective date of such sale or assignment. Without limiting the generality of the immediately preceding sentence, and for avoidance of doubt, in the event of such sale or assignment of the Loan:

(a)      the transferee or assignee of the Loan shall have no right to offset the Supply Payment Rebate (as defined in the Supply Agreement) against Obligations arising under the Debtor Documents, including the Note and this Agreement;

Exh. A  0039

(b)      the Supply Agreement shall cease being a Debtor Document and any amounts then or thereafter owing to FXI under the Supply Agreement shall cease being "Obligations" under the Debtor Documents;

(c)      any provisions in the Debtor Documents directly or indirectly providing that a violation by Debtor of the provisions of the Supply Agreement would constitute a Default or Event of Default under this Agreement or the other Debtor Documents shall be of no further force or effect; and

(d)      the 2% premium referred to in paragraph 3 of the Supply Agreement shall automatically be deemed eliminated, and the price of all Product (as defined in the Supply Agreement) theretofore and thereafter purchased by Debtor pursuant to the Supply Agreement, to the extent not already paid by Debtor, shall automatically be reduced by an amount equal to such 2% premium that would otherwise have been charged by FXI to Debtor.  In such event, Debtor and FXI agree to modify the Supply Agreement for the sole purpose of reflecting such changes if either of them requests such modification, but no failure to execute and deliver such modification shall be necessary to the effectiveness of the foregoing provisions of this Section.

[Signatures continue on following page]

6095820                                    25

Exh. A  0040

IN WITNESS WHEREOF, the parties have executed this Loan and Security Agreement as of the date first set forth above.

**DEBTOR:**

ANATOMIC GLOBAL, INC.,
a California corporation

By: _____
Name: David L. Farley
Title: President


**FXI:**

FOAMEX INNOVATIONS OPERATING COMPANY,
a Delaware corporation

By: _____
Name: DAVID J. PRILUTSKI
Its: CHIEF OPERATING OFFICER

Exh. A  0041

**EXHIBIT B**

# FIRST AMENDMENT TO
## SECOND AMENDED AND RESTATED
## PROMISSORY NOTE

THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED PROMISSORY NOTE ("this Amendment"), made and entered into this 10ᵗʰ day of November, 2010, by and between ANATOMIC GLOBAL, INC., , a California corporation ("Obligor"), and FOAMEX INNOVATIONS OPERATING COMPANY, a Delaware corporation ("FXI");

### W I T N E S S E T H :

WHEREAS, FXI heretofore made a term loan (the "Loan") to Obligor evidenced by that certain Second Amended and Restated Promissory Note dated May 18, 2010, made by Obligor to the order of FXI in the original principal amount of FOUR MILLION FIVE HUNDRED THIRTY-NINE THOUSAND NINE HUNDRED THIRTY-SEVEN AND 32/100 Dollars ($4,539,937.32) (the "Note"); and

WHEREAS, the Loan was made pursuant to that certain Loan and Security Agreement dated as of May 18, 2010 (the "Prior Loan Agreement") between Obligor and FXI; and

WHEREAS, in connection with the amendment and restatement of the Prior Loan Agreement by virtue of that certain Amended and Restated Loan and Security Agreement dated as of the date hereof (the "Loan Agreement") between Obligor and FXI, Obligor has requested that the Note be amended as hereinafter set forth, and FXI is willing to amend the Note on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing premises, the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, paid in hand by each party to the other, the receipt, adequacy and sufficiency of which are hereby acknowledged, Obligor and FXI hereby agree as follows:

1.     As a consequence of the capitalization of certain interest installments, or portions thereof, as permitted under the Note, Obligor and FXI acknowledge, confirm and agree that the aggregate principal amount outstanding under the Note is $4,578,801.27 as of the date hereof, of which $38,863.95 represents interest on the Note that has been capitalized through and including October 15, 2010.  Debtor specifically acknowledges and confirms that it does not have any valid offset (other than to the extent of any Purchase Rebate Amounts (as defined in the supply agreement referred to in the "PAYMENTS" section of the Note) or any defense to the indebtedness evidenced by the Note.

6095994

2.    From and after the date hereof, all references in the Note to the "Agreement" shall refer to the Loan Agreement, as the same may be further amended, modified, supplemented, renewed, extended or restated from time to time in accordance with the provisions thereof.

3.    The section of the Note captioned "DEFAULT" is hereby deleted in its entirety and the following substituted in lieu of the deleted provision:

"**EVENT OF DEFAULT.** Upon the occurrence and during the continuation of any Event of Default, then FXI may, in its sole and absolute discretion, declare the entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder and under the Agreement, immediately due and payable without notice or demand."

4.    The section of the Note captioned "DEFAULT RATE" is hereby deleted in its entirety and the following substituted in lieu of the deleted provision:

"**DEFAULT RATE.** From and after the occurrence and during the continuation of any Event of Default, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate ("Default Rate") equal to five percent (5%) over the Note Rate."

5.    The section of the Note captioned "COSTS AND EXPENSES" is hereby deleted in its entirety.

6.    The section of the Note captioned "LOSS, THEFT, DESTRUCTION AND/OR MUTILATION" is hereby deleted in its entirety and the following substituted in lieu of the deleted provision:

"<u>**LOSS, THEFT, DESTRUCTION AND/OR MUTILATION**</u>. In the event that this Note is destroyed, lost, stolen or mutilated, then Obligor shall, upon written request of FXI and upon either (a) receipt by Obligor of indemnification from FXI reasonably satisfactory to Obligor, with respect to the destroyed, lost or stolen Note, or (b) delivery by FXI to Obligor of the original mutilated Note (as the case may be), execute a new note identical in form and content to this Note, and when so executed the new note shall be deemed a replacement of this Note and shall have the same force and effect as if it were this Note in the original form.

7.    **THE INDEBTEDNESS EVIDENCED BY THE NOTE IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR DEBT (AS DEFINED IN THE DEBT AND LIEN SUBORDINATION AGREEMENT HEREINAFTER REFERRED TO) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE DEBT AND LIEN SUBORDINATION AGREEMENT DATED AS OF NOVEMBER _, 2010 (AS THE SAME MAY BE AMENDED, RESTATED, OTHERWISE MODIFIED OR REPLACED FROM TIME TO TIME) MADE BY OBLIGOR AND FXI IN FAVOR OF CELTIC**

2

Exh. B 0044

CAPITAL CORPORATION, AS SENIOR CREDITOR THEREUNDER, AND
ANY PERMITTED SUBSEQUENT HOLDER OF THE SENIOR DEBT.

8.      Obligor and FXI agree that this instrument is not intended to be, and shall not constitute, a novation.

9.      Obligor and FXI agree that a duplicate original of this Amendment shall be attached and affixed to the original Note.

10.     This Amendment shall be governed by and construed under the laws of the State of California.

11.     Except as expressly modified hereby, the Note remains in full force and effect, Obligor and FXI hereby ratifying and affirming the same, as herein amended.

**[SIGNATURES ON NEXT PAGE]**

3

IN WITNESS WHEREOF, Obligor and FXI have executed and sealed this First
Amendment to Second Amended and Restated Promissory Note as of the day and year first
above written.

Obligor:

ANATOMIC GLOBAL, INC.

By _____

     David L. Farley
     President


FXI:

FOAMEX INNOVATIONS OPERATING
COMPANY

By _____
Print Name: _DAVID J. PRILUTSKI_
Title: _CHIEF OPERATING OFFICER_

[First Amendment to Second Amended
and Restated Promissory Note – FXI/AGI]

4

Exh. B 0046

# SECOND AMENDED AND RESTATED PROMISSORY NOTE
## LOS ANGELES, CALIFORNIA

$4,539,937.32

May 18, 2010

FOR VALUE RECEIVED, ANATOMIC GLOBAL, INC., a California corporation, formerly known as Anatomic Concepts, Inc. ("Obligor"), promises to pay to FOAMEX INNOVATIONS OPERATING COMPANY, a Delaware corporation ("FXI"), or order, at Rose Tree Corporate Center II, Media, Pennsylvania 19063-2076, or at such other place as the holder hereof may designate, in lawful money of the United States of America, the principal sum of FOUR MILLION FIVE HUNDRED THIRTY-NINE THOUSAND NINE HUNDRED THIRTY SEVEN AND 32/100 DOLLARS ($4,539,937.32) together with interest on the outstanding principal balance, until paid in full in accordance with the terms, conditions, and provisions as hereinafter set forth in this Second Amended and Restated Promissory Note ("Note").

Obligor has heretofore executed and delivered to and in favor of FXI that certain Amended and Restated Promissory Note dated as of September 16, 2005, in the principal sum of $1,327,817.93 ("Existing Note"). This Note amends and restates in its entirety the Existing Note as of the date hereof.

**LOAN AND SECURITY AGREEMENT.** This Note is secured by, among other things, that certain Loan and Security Agreement of even date herewith, executed by Obligor in favor of FXI ("Agreement"). Capitalized terms not defined herein shall have the meaning assigned to them in the Agreement.

**INTEREST.** Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred sixty (360)-day year and actual days elapsed and shall accrue at the per annum rate (the "Note Rate") of seven and a half percent (7.5%) plus the six month London Interbank Offered Rate ("LIBOR") rate as published in the Wall Street Journal on the last business day of the preceding month in which payment is due ("Note Rate"); provided, however, that interest shall accrue at the Note Rate commencing on May 15, 2010.

**PAYMENTS.**

Commencing on June 15, 2010, and on the fifteenth day of each calendar month thereafter through and including March 15, 2011, interest shall be due and payable in an initial monthly installment of $30,304.08, as may be modified from time to time by any change in the Note Rate (as described above).

Commencing on April 15, 2011, and on the 15th day of each calendar month thereafter until the Maturity Date (as hereinafter defined), Borrower shall pay to Lender a monthly installment of principal and interest in the amount specified for each due date as set forth in Schedule "A" attached hereto, as may be modified from time to time to reflect any change in the Note Rate.

643228.2

Exh. B 0047

Notwithstanding the foregoing, Lender and Borrower anticipate that the 2% rebate (the "Rebate") issued by Lender to Borrower for purchases of polyurethane foam from Lender by Borrower pursuant to a supply agreement dated the date hereof shall be sufficient to satisfy the $30,304.08 initial monthly interest payment (the "Initial Interest Payment"). However, in the event the Rebate is not sufficient to satisfy the Initial Interest Payment, Borrower shall not be required to pay any shortfall in cash, but instead, such shortfall shall be factored into the amortization schedule set forth in Schedule "A" attached hereto and Lender shall promptly recalculate Schedule "A" and provide a copy of same to Borrower. To the extent the Rebate is more than sufficient to satisfy the Initial Interest Payment, any excess amount shall be factored into the amortization schedule set forth in Schedule "A" attached hereto and Lender shall promptly recalculate Schedule "A" and provide a copy of same to Borrower. All payments due hereunder, including payments of principal and interest, shall be made to FXI in United States Dollars and shall be in the form of a wire transfer or other form of immediately available funds.

Upon the Maturity Date (as defined hereinafter), the entire unpaid obligation outstanding under this Note shall become due and payable in full.

**APPLICATION OF PAYMENTS.** All payments received by FXI from, or for the account of Obligor, due hereunder shall be applied by FXI, in the following manner:

    a.    First. To pay any and all interest due, owing and accrued on this Note;

    b.    Second. To pay any and all costs, advances, expenses or fees due, owing and payable to FXI, or paid or incurred by FXI, arising from or out of this Note, the Agreement and the other Debtor Documents;

    c.    Third. Payment of the outstanding principal balance on this Note.

**MATURITY DATE.** On May 15, 2015, the entire unpaid principal balance together with all accrued and unpaid interest and all other amounts and payments due hereunder, shall be due and payable without demand or notice (the "Maturity Date").

**UNPAID INTEREST, CHARGES AND COSTS.** Interest, late charges, costs or expenses that are not received by FXI within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of FXI, be added to the principal balance and shall from the date due bear interest at the Default Rate (as hereinafter defined).

**NO OFFSETS OR DEDUCTIONS.** Except as expressly provided in this Note, all payments under this Note shall be made by Obligor without decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any governmental agency. If at any time, present or future, FXI shall be compelled by any law or any other such requirement that on its face or by its application requires or establishes reserves, payment deduction or withholding of taxes, imposts or duties, which causes a decrease, reduction or deduction (as is described above) in the payment received by FXI, then Obligor shall pay to FXI such additional amounts, as FXI shall deem necessary and appropriate, such that every payment received under this Note,

Exh. B 0048

after such decrease, reserve, reduction, payment deduction or required withholding, shall not be reduced in any manner whatsoever.

<u>DEFAULT</u>.   In the event that:

(1)   FXI does not receive a payment required to be paid by the terms of this Note in the amount, within the time or in the manner set forth herein;

(2)   Obligor does not faithfully perform each and every term, condition and provision contained in the Agreement, this Note, any of the Invoices, the Debtor Documents, or any other obligation of Obligor to FXI;

(3)   Any guarantor ("Guarantor") does not faithfully perform each and every term, condition and provision in the Guaranty executed by Guarantor in connection with the obligations of Obligor to FXI.

(4)   Any representation or warranty made or financial statement, certificate or other document provided by Obligor or Guarantor to FXI shall prove to have been false or misleading;

(5)   Any proceeding under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including, but not limited to, assignments for the benefit of creditors, formal or informal moratoriums, compositions or extensions with some or all creditors is commenced by or against Obligor or Guarantor;

(6)   Any state, federal or local governmental agency shall take any action against Obligor or any other event shall occur, any of which, in the judgment of FXI, might have a material adverse effect on the financial condition or business of Obligor;

(7)   All or any of Obligor's assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any judicial officer or assignee;

(8)   Any judgment shall be entered against Obligor that, in the judgment of FXI, might have a material adverse effect on the financial condition or business of Obligor;

(9)   Obligor or Guarantor dies, becomes legally incompetent, or ceases to operate its or his business as it is presently conducted; or

(10)   Obligor defaults in any other obligation of Obligor to any other person;

then FXI may, in its sole and absolute discretion, declare the entire unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder and under the Agreement, immediately due and payable without notice or demand.

<u>DEFAULT RATE</u>.   From and after the occurrence of any Default in this Note whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and

Exh. B 0049

late charges) shall bear interest at a per annum rate ("Default Rate") equal to five percent (5%) over the Note Rate.

**PREPAYMENT**. The principal amount of this Note may be prepaid in whole or in part without any premium or penalty; provided, however, that, written notice of prepayment is received by FXI concurrently therewith. Any such prepayment shall not result in a reamortization, deferral, postponement, suspension or waiver of any and all principal payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Obligor acknowledges that if any payment required under this Note is not received by FXI within ten (10) days after the same becomes due and payable, FXI will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by FXI by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Obligor agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which FXI is entitled to receive upon such breach, in compensation therefor. Therefore, Obligor shall, in such event, without further demand or notice, pay to FXI, as FXI's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Obligor to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Obligor the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of FXI to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of FXI to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Debtor Documents, or to declare a default hereunder or under any of the Debtor Documents.

**COSTS AND EXPENSES**. Obligor hereby agrees to pay any and all costs or expenses paid or incurred by FXI by reason of, as a result of, or in connection with the enforcement of this Note, Agreement and the other Debtor Documents, including, but not limited to, any and all attorney's fees and related costs when such costs or expenses are paid or incurred in connection with the enforcement of this Note, Agreement and the other Debtor Documents, or any of them, the protection or preservation of the collateral or security for this Note or any other rights, remedies or interests of FXI, whether or not suit is filed. Obligor's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in or in connection with any bankruptcy proceeding, in enforcing any judgment obtained by FXI, and in connection with any and all appeals therefrom. All such costs and expenses are immediately due and payable to FXI by Obligor whether or not demand therefor is made by FXI.

**WAIVERS**. Obligor hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note, and the right to plead any statute of limitations as a defense. No delay, omission or failure on the part of FXI in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of FXI.

Exh. B 0050

**MAXIMUM LEGAL RATE.**  This Note is subject to the express condition that at no time shall Obligor be obligated, or required, to pay interest on the principal balance at a rate that could subject FXI to either civil or criminal liability as a result of such rate being in excess of the maximum rate that Obligors are permitted by law to contract or agree to pay.  If by the terms of this Note Obligor is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, and shall retroactively be deemed to have been payments made, in reduction of the principal balance of this Note.

**LOSS, THEFT, DESTRUCTION AND/OR MUTILATION.**  In the event that this Note is destroyed, lost, stolen or mutilated, then Obligor shall, upon written request of FXI, execute a new note identical in form and content to this Note, and when so executed the new note shall be deemed a replacement of this Note and shall have the same force and effect as if it were this Note in the original form.

**AMENDMENTS.**  This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action.  This Note shall be governed by and construed under the laws of the State of California.

**EXECUTION.**  Obligor hereby represents and warrants that, by Obligor's execution below, Obligor has the full power, authority and legal right to execute and deliver this Note and that the debt evidenced hereby constitutes a valid and binding obligation of Obligor without exception.

**AUTHORITY.**  Obligor, and each person executing this Note on Obligor's behalf, hereby represents and warrants to FXI that, by its execution below, Obligor has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Obligor without exception or limitation.  In the event that this Note is executed by more than one person or entity, the liability hereunder shall be joint and several.

**USA PATRIOT ACT NOTICE.**  Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information.  Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower or other related persons.

[Signature page to follow.]

643228.2                                                    5

Exh. B 0051

IN WITNESS WHEREOF, Obligor has executed this Note on the day and year first above written.

Obligor:

ANATOMIC GLOBAL, INC.,
a California corporation

By: _____
Name: David L. Farley
Its:  President

643228.2                                    6

Exh. B 0052

## SCHEDULE "A"
PAYMENT SCHEDULE

Please see attached.

Exh. B 0053

## SCHEDULE "A"

| Original | Principal: | $4,539,937.32 | (3,851,299.63 + 688,637.69 Note) |
|---|---|---|---|
| | Term | 60 | 11 Months Interest only |
| | Interest | 8.01% | 6 Month Libor + 7.5% |

| Payment No. | Payment Date | Beginning Balance | Interest 8.01% | Payment | Ending Balance |
|---|---|---|---|---|---|
| 1 | 6/15/2010 | $4,539,937.32 | $30,304.08 | $30,304.08 | $4,539,937.32 |
| 2 | 7/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 3 | 8/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 4 | 9/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 5 | 10/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 6 | 11/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 7 | 12/15/2010 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 8 | 1/15/2011 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 9 | 2/15/2011 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 10 | 3/15/2011 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 11 | 4/15/2011 | $ 4,539,937.32 | $30,304.08 | $30,304.08 | $ 4,539,937.32 |
| 12 | 5/15/2011 | $ 4,539,937.32 | $30,304.08 | $108,934.48 | $ 4,461,306.92 |
| 13 | 6/15/2011 | $ 4,461,306.92 | $29,779.22 | $108,934.48 | $ 4,382,151.66 |
| 14 | 7/15/2011 | $ 4,382,151.66 | $29,250.86 | $108,934.48 | $ 4,302,468.04 |
| 15 | 8/15/2011 | $ 4,302,468.04 | $28,718.97 | $108,934.48 | $ 4,222,252.53 |
| 16 | 9/15/2011 | $ 4,222,252.53 | $28,183.54 | $108,934.48 | $ 4,141,501.59 |
| 17 | 10/15/2011 | $ 4,141,501.59 | $27,644.52 | $108,934.48 | $ 4,060,211.63 |
| 18 | 11/15/2011 | $ 4,060,211.63 | $27,101.91 | $108,934.48 | $ 3,978,379.06 |
| 19 | 12/15/2011 | $ 3,978,379.06 | $26,555.68 | $108,934.48 | $ 3,896,000.26 |
| 20 | 1/15/2012 | $ 3,896,000.26 | $26,005.80 | $108,934.48 | $ 3,813,071.58 |
| 21 | 2/15/2012 | $ 3,813,071.58 | $25,452.25 | $108,934.48 | $ 3,729,589.35 |
| 22 | 3/15/2012 | $ 3,729,589.35 | $24,895.01 | $108,934.48 | $ 3,645,549.88 |
| 23 | 4/15/2012 | $ 3,645,549.88 | $24,334.05 | $108,934.48 | $ 3,560,949.45 |
| 24 | 5/15/2012 | $ 3,560,949.45 | $23,769.34 | $108,934.48 | $ 3,475,784.31 |
| 25 | 6/15/2012 | $ 3,475,784.31 | $23,200.86 | $108,934.48 | $ 3,390,050.69 |
| 26 | 7/15/2012 | $ 3,390,050.69 | $22,628.59 | $108,934.48 | $ 3,303,744.80 |
| 27 | 8/15/2012 | $ 3,303,744.80 | $22,052.50 | $108,934.48 | $ 3,216,862.82 |
| 28 | 9/15/2012 | $ 3,216,862.82 | $21,472.56 | $108,934.48 | $ 3,129,400.90 |
| 29 | 10/15/2012 | $ 3,129,400.90 | $20,888.75 | $108,934.48 | $ 3,041,355.17 |
| 30 | 11/15/2012 | $ 3,041,355.17 | $20,301.05 | $108,934.48 | $ 2,952,721.74 |
| 31 | 12/15/2012 | $ 2,952,721.74 | $19,709.42 | $108,934.48 | $ 2,863,496.68 |
| 32 | 1/15/2013 | $ 2,863,496.68 | $19,113.84 | $108,934.48 | $ 2,773,676.04 |
| 33 | 2/15/2013 | $ 2,773,676.04 | $18,514.29 | $108,934.48 | $ 2,683,255.85 |
| 34 | 3/15/2013 | $ 2,683,255.85 | $17,910.73 | $108,934.48 | $ 2,592,232.10 |
| 35 | 4/15/2013 | $ 2,592,232.10 | $17,303.15 | $108,934.48 | $ 2,500,600.77 |
| 36 | 5/15/2013 | $ 2,500,600.77 | $16,691.51 | $108,934.48 | $ 2,408,357.80 |
| 37 | 6/15/2013 | $ 2,408,357.80 | $16,075.79 | $108,934.48 | $ 2,315,499.11 |
| 38 | 7/15/2013 | $ 2,315,499.11 | $15,455.96 | $108,934.48 | $ 2,222,020.59 |
| 39 | 8/15/2013 | $ 2,222,020.59 | $14,831.99 | $108,934.48 | $ 2,127,918.10 |
| 40 | 9/15/2013 | $ 2,127,918.10 | $14,203.85 | $108,934.48 | $ 2,033,187.47 |
| 41 | 10/15/2013 | $ 2,033,187.47 | $13,571.53 | $108,934.48 | $ 1,937,824.52 |
| 42 | 11/15/2013 | $ 1,937,824.52 | $12,934.98 | $108,934.48 | $ 1,841,825.02 |
| 43 | 12/15/2013 | $ 1,841,825.02 | $12,294.18 | $108,934.48 | $ 1,745,184.72 |
| 44 | 1/15/2014 | $ 1,745,184.72 | $11,649.11 | $108,934.48 | $ 1,647,899.35 |
| 45 | 2/15/2014 | $ 1,647,899.35 | $10,999.73 | $108,934.48 | $ 1,549,964.60 |
| 46 | 3/15/2014 | $ 1,549,964.60 | $10,346.01 | $108,934.48 | $ 1,451,376.13 |
| 47 | 4/15/2014 | $ 1,451,376.13 | $9,687.94 | $108,934.48 | $ 1,352,129.59 |
| 48 | 5/15/2014 | $ 1,352,129.59 | $9,025.47 | $108,934.48 | $ 1,252,220.58 |
| 49 | 6/15/2014 | $ 1,252,220.58 | $8,358.57 | $108,934.48 | $ 1,151,644.67 |

Exh. B 0054

| 50 | 7/15/2014 | $ | 1,151,644.67 | $7,687.23 | $108,934.48 | $ | 1,050,397.42 |
| 51 | 8/15/2014 | $ | 1,050,397.42 | $7,011.40 | $108,934.48 | $ | 948,474.34 |
| 52 | 9/15/2014 | $ | 948,474.34 | $6,331.07 | $108,934.48 | $ | 845,870.93 |
| 53 | 10/15/2014 | $ | 845,870.93 | $5,646.19 | $108,934.48 | $ | 742,582.64 |
| 54 | 11/15/2014 | $ | 742,582.64 | $4,956.74 | $108,934.48 | $ | 638,604.90 |
| 55 | 12/15/2014 | $ | 638,604.90 | $4,262.69 | $108,934.48 | $ | 533,933.11 |
| 56 | 1/15/2015 | $ | 533,933.11 | $3,564.00 | $108,934.48 | $ | 428,562.63 |
| 57 | 2/15/2015 | $ | 428,562.63 | $2,860.66 | $108,934.48 | $ | 322,488.81 |
| 58 | 3/15/2015 | $ | 322,488.81 | $2,152.61 | $108,934.48 | $ | 215,706.94 |
| 59 | 4/15/2015 | $ | 215,706.94 | $1,439.84 | $108,934.48 | $ | 108,212.30 |
| 60 | 5/15/2015 | $ | 108,212.30 | $722.32 | $108,934.48 | $ | 0.14 |

Exh. B 0055

**EXHIBIT C**

Exh. C 0056

## CONTINUING GUARANTY

The undersigned, DAVID L. FARLEY, an individual (herein called "Guarantor"), at the solicitation of ANATOMIC GLOBAL, INC., a California corporation, formerly known as Anatomic Concepts, Inc. ("Debtor"), requests FOAMEX INNOVATIONS OPERATING COMPANY, a Delaware corporation (herein called "FXI"), to extend Credit to Debtor. In order to induce FXI to extend Credit to Debtor, and in consideration of Credit heretofore, now or hereafter granted to Debtor by FXI, Guarantor agrees as follows:

1.      The term "Credit" is used throughout this Continuing Guaranty ("Guaranty") in its most comprehensive sense and means and includes, without limitation, any and all loans, advances, debts, obligations and liabilities of any kind or nature owed by Debtor to FXI, heretofore, now, or hereafter made, incurred or created, arising from the Debtor Documents as defined in the Loan and Security Agreement dated May 18, 2010 between Debtor and FXI ("Agreement"), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether on original, renewed, extended or revised terms (including, without limitation, those evidenced by new or additional instruments or agreements or those changing the applicable rate of interest or which release any obligor with respect thereto), whether principal, interest, fees, or expenses, whether Debtor may be liable individually or jointly with others, whether recovery upon such indebtedness may be or hereafter becomes barred by any statute of limitations, and whether such indebtedness may be or hereafter becomes invalid or otherwise unenforceable. In the event a petition under the United States Bankruptcy Code is filed by or against Debtor, the term "Debtor" shall also mean and include Debtor in its status as a debtor, debtor-in-possession and/or reorganized debtor under the United States Bankruptcy Code.

2.      (a) If there is more than a single entity or person included in the terms "Guarantor" or "Debtor," respectively, each reference herein to such terms shall mean any and all, and one or more of such entities and persons both jointly and severally, and (b) if more than one person or entity executes this Guaranty, the obligations and liabilities hereunder of Guarantors are and shall be both joint and several. If Debtor is a corporation, partnership, limited liability company or association, each reference herein to the term "Debtor" shall include any successor entity to Debtor. If there is more than one guaranty of the obligations of Debtor, the liabilities of all Guarantors are joint and several. As used in this Guaranty, neuter terms include the masculine and feminine, and vice versa.

3.      Unless specified herein to the contrary, Guarantor's liability hereunder shall be unlimited. In addition to any maximum liability hereunder, Guarantor agrees to bear and be liable to FXI for the expenses enumerated in paragraph 21 hereof. Notwithstanding the foregoing, FXI, at its discretion, may allow Credit to exceed Guarantor's maximum liability hereunder. Any payment by Guarantor shall not reduce the maximum obligation of Guarantor hereunder unless written notice to that effect is actually received by FXI at or prior to the time of such payment. Any payment received by FXI from Debtor, from

Exh. C 0057

any other person or from proceeds of collateral granted by Debtor or any other person shall not reduce Guarantor's maximum liability hereunder.

4.     Guarantor unconditionally guarantees and agrees to pay to FXI, on demand, in lawful money of the United States of America, an amount equal to the amount of the Credit, and to otherwise perform any obligations of Debtor undertaken pursuant to any Credit. This Guaranty is a guaranty of payment and not of collection. No payment received by FXI from Debtor or any other person or from proceeds of collateral granted by Debtor or any other person shall reduce Guarantor's maximum liability hereunder.

5.     Either before or after revocation hereof, Guarantor authorizes FXI at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of any Credit by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of any Credit including the rate of interest thereon, (c) accept partial payment on any Credit, (d) accept new or additional instruments, agreements or documents relative to any Credit, (e) release, substitute or add one or more endorsers, cosigners or guarantors for any Credit, (f) enter into forbearances with Debtor even though the result of such forbearance is to increase the amount of accrued and unpaid interest, cost, fees and/or expenses attributable to the Credit, (g) amend or modify the terms of any guaranty executed by a co-guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of any Credit and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired collateral securing payment of the Credit or any guaranty therefor on such terms as FXI at its sole discretion shall determine, (j) subordinate payment of all or any part of the Credit to other creditors of Debtor or other persons on such terms as FXI deems appropriate, (k) apply any sums received from Debtor, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any indebtedness whatsoever in any order and regardless of whether or not such indebtedness is guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of the Credit in any order regardless of whether or not the Credit is secured by collateral or is due and payable, and (m) exercise any right or remedy it may have with respect to any Credit or any collateral securing any Credit, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or any Credit.

6.     Guarantor acknowledges that Guarantor may have certain rights under applicable law which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantors' liability under this Guaranty. Among those rights, are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of

Exh. C 0058

any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)     To require FXI to notify Guarantor of any default by Debtor, provide Guarantor with notice of any sale or other disposition of security for any Credit, disclose information with respect to the Credit, Debtor, or any other guarantor, co-signer or endorser, or with respect to any collateral;

(b)     That Guarantor's obligation under this Guaranty must be commensurate with that of Debtor;

(c)     To be discharged based upon the absence of any liability of Debtor, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Debtor or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Credit are altered in any respect;

(e)     To be discharged upon acceptance by FXI of anything in partial satisfaction of the Credit, and/or if FXI designates the portion of the Credit to be satisfied;

(f)     To be discharged upon any modification of the Credit or the release by FXI of Debtor or any other guarantor, endorser or co-signer;

(g)     To require FXI to proceed against Debtor, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in FXI's power;

(h)     To receive the benefit of or participate in any and all security for repayment and/or performance of the Credit;

(i)     To have any security for the Credit first applied to satisfy or discharge the Credit;

(j)     That any arbitration award rendered against Debtor not constitute an award against Guarantor;

(k)     To be discharged based upon any failure by FXI to perfect or continue perfection of any lien, use due diligence to collect all or any part of any Credit, or if recovery against Debtor becomes barred by any statute of limitations, or if Debtor is not liable for any deficiency after FXI realizes upon any collateral; and

(l)     To be discharged due to the release or discharge of any collateral for any Credit or guaranty, or relating to the validity, value or enforceability of any collateral.

Exh. C 0059

7.    [Intentionally omitted.]

8.    Guarantor also waives all rights and defenses arising out of an election of remedies by FXI, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9.    Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance, notices of the existence, creation or increase of any new or additional credit, notice of sale in regard to judicial or non-judicial foreclosure of real or personal property collateral and all other notices and demands of any kind or nature whatsoever except as expressly set forth herein.

10.    Notwithstanding any foreclosure of the lien of any security agreements, deeds of trust, mortgages or other security instruments, with respect to the Credit or any other guaranty, whether by the exercise of the power of sale contained therein, by any action for judicial foreclosure, or by any acceptance of a deed or other transfer in lieu of foreclosure, whether or not such method of foreclosure or transfer in lieu of foreclosure was for a consideration equal to or greater than the fair market value of the security property, Guarantor shall remain bound under this Guaranty for the obligations of Debtor to FXI and shall be liable to FXI for any and all of the Credit remaining unpaid after any such foreclosure.

11.    Guarantor represents and warrants to FXI that: (a) FXI has made no representation to Guarantor in regard to Debtor, the Credit or any matters pertaining thereto, upon which Guarantor is relying in giving this Guaranty; and (b) Guarantor has established adequate means and assumes the responsibility for being and keeping informed of the financial condition of Debtor and of all other circumstances bearing upon the risk of nonpayment of the credit which diligent inquiry would reveal, and FXI shall have no duty to advise Guarantor of information known to FXI regarding such condition or any such circumstance.

12.    In addition to all liens upon and rights of setoff against monies, securities or other property of Guarantor given to FXI by law or otherwise as security for this Guaranty, Guarantor hereby pledges to FXI and grants to FXI a security interest in, and FXI shall have a right of setoff against, all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with FXI, whether held in a general or special account or deposit or for safekeeping or otherwise; and each such security interest or right of setoff may be enforced or exercised without demand upon, or notice to, Guarantor. No action or lack of action by FXI with respect to any security interest or right of setoff or otherwise shall be deemed a waiver thereof, and every right of setoff or security interest or otherwise shall continue in full force and effect until specifically released by FXI in writing. The security interests created hereby shall secure all of

Exh. C 0060

Guarantor's obligations to FXI under this Guaranty or any subsequent guaranty executed by Guarantor.

13.    Any and all indebtedness of Debtor now or hereafter owed to Guarantor and all claims of Guarantor against Debtor, whenever arising, are hereby subordinated to the Credit and assigned to FXI as additional collateral. If FXI so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Debtor shall be delivered to FXI, and such indebtedness and all claims of Guarantor against Debtor shall be collected, enforced and received by Guarantor as trustee for FXI and be paid over to FXI on account of the Credit but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Debtor and pay the proceeds to FXI, FXI, as Guarantor's attorney-in-fact may do such acts and sign such documents in Guarantor's name as FXI considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints FXI as Guarantor's attorney-in-fact for such purposes. If Debtor is a corporation, limited liability company or partnership, Guarantor will not withdraw or accept, without FXI's prior written consent, any return of any capital invested or equity interest in Debtor.

14.    Guarantor agrees that to the extent Debtor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Debtor to FXI, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, together with the guaranty thereof hereunder, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Debtor.

15.    Guarantor agrees that to the extent Guarantor makes a payment or payments or is credited for any payment or payments made for the account of or on behalf of Guarantor to FXI, which payment or payments, or any part thereof, are subsequently invalidated, determined to be fraudulent or preferential, voided, set aside and/or required to be repaid to any trustee, receiver, assignee or any other party whether under any Bankruptcy, State or Federal Law, common law or equitable cause or otherwise, then to the extent thereof, the obligation or part thereof intended to be satisfied thereby, shall be revived, reinstated and continued in full force and effect as if said payment or payments had not originally been made by or for the account of or on behalf of Guarantor.

16.    Guarantor's obligations hereunder are not contingent upon and are independent of the obligations of Debtor, or any other guarantor or surety of the Credit. This Guaranty is not made in consideration of the liability of any other guarantor or surety of the Credit. The release or death of any guarantor of the Credit or the revocation of any guaranty shall not release or otherwise affect the liability of any other non-revoking guarantor. A separate action or actions may be brought and prosecuted against Guarantor whether

Exh. C 0061

action is brought against Debtor or any other guarantor or whether Debtor or any other guarantor be joined in any such action or actions.

17.     To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Credit, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Debtor which operates to toll any statute of limitations as to Debtor shall likewise toll the statute of limitations as to Guarantor.

18.     Any married person who signs this Guaranty expressly agrees that recourse may be had against his/her separate property as well as all community property over which that person has a power of management and control, for all of his/her obligations hereunder.

19.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall remain effective.

20.     FXI may, with or without notice, assign this Guaranty in whole or in part. This Guaranty shall inure to the benefit of FXI, its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, representatives, successors and assigns.

21.     Guarantor agrees to pay to FXI, on demand, reasonable attorneys' fees and all other costs and expenses which may be incurred by FXI in the collection or attempted collection from Debtor of any Credit and/or in the interpretation, enforcement or attempted enforcement by FXI of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings touching the Credit or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon at the rate applicable to the Credit and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

22.     Guarantor warrants and represents to FXI that:

        (a)     All financial statements and other financial information furnished or to be furnished to FXI by Guarantor are or will be true and correct and do and will fairly represent the financial condition of Guarantor (including all contingent liabilities) as of the dates thereof; and

        (b)     There has been no material adverse change in Guarantor's financial condition since the dates of the financial statements and other information furnished to FXI, except as previously disclosed to FXI in writing.

Exh. C 0062

23.     FXI may declare Guarantor in default under this Guaranty upon the occurrence of any of the following events:

    (a)     Guarantor fails to pay or perform any of Guarantor's obligations under this Guaranty; or

    (b)     Any representation or warranty made or given by Guarantor to FXI proves to be false or misleading in any material respect; or

    (c)     A petition or action for relief shall be filed by or against Guarantor, pursuant to the Federal Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief from debts; the appointment of a receiver, trustee, custodian or liquidator of or for any property of Guarantor; or upon the death, incapacity, insolvency, dissolution, or termination of the business of Guarantor; or

    (d)     Guarantor revokes or attempts to revoke this Guaranty.

24      If Debtor is a corporation, limited liability company or partnership, FXI need not inquire into the power of Debtor or the authority of its officers, directors, partners, agents, members or managers acting or purporting to act in its behalf, and any Credit granted in reliance upon the purported exercise of such power or authority is guaranteed hereunder.

25.     Receipt of a true copy of this Guaranty is hereby acknowledged by each Guarantor.  Guarantor understands and agrees that FXI's acceptance of this Guaranty shall not constitute a commitment of any nature whatsoever by FXI to extend, renew or hereafter extend credit to Debtor.  Guarantor agrees that this Guaranty shall be effective with or without notice from FXI of its acceptance of this Guaranty.

26.     If Guarantor has executed more than one Guaranty of any or all indebtedness of Debtor owed to FXI, any limits of liability thereunder and hereunder shall be cumulative, and a subsequent guaranty executed by Guarantor shall not supersede or replace this Guaranty unless such subsequent guaranty so provides.

27.     GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INSTITUTED BY FXI OR GUARANTOR WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS GUARANTY, THE CREDIT, THE COLLATERAL THEREFOR OR ANY MATTER ARISING THEREFROM OR RELATING HERETO OR THERETO.

28.     Guarantor waives all rights to interpose any setoffs or counterclaims of any nature in any action or proceeding instituted by FXI with respect to this Guaranty, the collateral therefor, or any matter arising therefrom or relating thereto and the posting of any bond which may otherwise be required, and waives any and all benefits of cross-demands pursuant to section 431.70 of the California Code of Civil Procedure.

Exh. C 0063

29.     Guarantor hereby irrevocably submits and consents to the jurisdiction of any
federal or state court of competent jurisdiction within California in connection with any
action or proceeding arising out of or relating to this Guaranty.  In any such litigation,
Guarantor consents to service of process by any means authorized by California or
federal law or as otherwise agreed in writing between FXI and Guarantor.

30.     All rights, remedies, powers and benefits granted to FXI under this Guaranty, the
Credit, any oral or other written agreement or applicable law whether expressly granted
or implied in law or otherwise, are cumulative and not exclusive, and are enforceable
alternatively, successively, or concurrently on any one or more occasions at FXI's
discretion.

31.     FXI shall not, by any act, delay, omission or otherwise be deemed to have
expressly or impliedly waived any security interest granted to FXI hereunder or FXI's
rights, powers and/or remedies hereunder (including any right of setoff) unless such
waiver shall be in writing and signed by an authorized officer of FXI.  Any such waiver
shall be enforceable only to the extent specifically set forth therein.  A waiver by FXI of
any default, right, power and/or remedy on any one occasion shall not be construed as a
bar to or waiver of any such default, right, power and/or remedy which FXI would
otherwise have on any future occasion whether similar in kind or otherwise.  Any failure
by FXI to file or enforce a claim against the estate (whether in administration,
bankruptcy, probate or other proceeding) of Debtor or of any others, shall not affect
Guarantor's liability hereunder.

32.     Neither this Guaranty nor any related agreement, document or instrument nor any
provision hereof or thereof shall be amended, modified or discharged orally or by course
of conduct, but only by a written agreement signed by an authorized officer of FXI
expressly referring to this Guaranty and to the provisions so amended, modified or
discharged.

33.     FXI's books and records showing the account(s) between FXI and Debtor shall be
admissible in evidence in any action or proceeding as prima facie proof of the items set
forth therein.  FXI's statements rendered to Debtor, to the extent to which no objection is
made within thirty (30) days after date thereof, shall be deemed conclusively correct and
constitute an account stated absent manifest error, which shall be binding on Guarantor
whether or not Guarantor receives a copy of any such statement or notice thereof.

34.     This is a continuing guaranty of the Credit, including those arising after any
repayment and reborrowing and under any successive and future transactions which may
increase, renew or continue the original Credit.  Revocation of this Guaranty, if permitted
by applicable law, shall be effective only upon the close of the next business day after
written notice thereof is received by an officer of FXI by certified or registered mail,
return receipt requested at Rose Tree Corporate Center II, Media, Pennsylvania 19063-
2076, or at any other office of FXI designated in a written notice mailed by FXI to
Guarantor at its address set forth below.  Any such revocation shall be effective only as to
the revoking party and shall not affect that party's obligations with respect to Credit

Exh. C 0064

existing before the revocation became effective or as to any renewals, extensions or modifications of any Credit, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rate of interest on any Credit, or for post-revocation interest and collection expenses accruing or incurred by FXI with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until FXI has received indefeasible payment in full of all Credit which is guaranteed hereby and, in regard to which Credit, FXI no longer has an outstanding commitment to lend. Credit existing before revocation becomes effective shall be deemed to include, without limitation, all Credit or advances which FXI has committed to make to Debtor in reliance upon this Guaranty, even though the amount of such Credit or advances has not been advanced as of the effective date of revocation, and even though FXI may have defenses or defaults which would relieve it of such commitment, if asserted.

35.    The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

36.    GUARANTOR ACKNOWLEDGES THAT FXI HAS OR MAY IN THE FUTURE EXTEND CREDIT TO DEBTOR IN RELIANCE ON GUARANTOR'S UNCONDITIONAL PROMISE TO REPAY ANY AND ALL CREDIT AND FXI IS RELYING ON THE WAIVERS, WARRANTIES AND PROMISES MADE BY GUARANTOR IN THIS GUARANTY. GUARANTOR AGREES THAT EACH OF THE WAIVERS, WARRANTIES AND PROMISES SET FORTH IN THIS GUARANTY ARE MADE WITH GUARANTOR'S UNDERSTANDING OF THEIR SIGNIFICANCE AND CONSEQUENCES AND THAT THEY ARE REASONABLE. IF ANY WAIVERS, WARRANTIES AND PROMISES ARE DETERMINED TO BE CONTRARY TO ANY APPLICABLE LAW OR PUBLIC POLICY, SUCH WAIVERS, WARRANTIES AND PROMISES SHALL BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY LAW. BEFORE SIGNING THE GUARANTY, GUARANTOR HAS EITHER SOUGHT THE ADVICE OF COUNSEL TO EXPLAIN THE WAIVERS OF ITS RIGHTS AND DEFENSES AS STATED HEREIN AND THE EFFECT THEREOF, OR HAS HAD THE OPPORTUNITY TO SEEK SUCH COUNSEL, AND IN ANY EVENT, INTENDS THIS GUARANTY TO BE AS UNRESTRICTED AS POSSIBLE. GUARANTOR THEREFORE HAS CONSCIOUSLY AND INTENTIONALLY WAIVED ALL DEFENSES OF GUARANTOR AND RIGHTS WHICH COULD EXONERATE GUARANTOR HEREUNDER TO THE FULL EXTENT PERMITTED BY THE LAWS OF THE STATE OF CALIFORNIA, WHETHER OR NOT EACH AND EVERY DEFENSE, RIGHT OR WAIVER IS EXPLAINED OR DESCRIBED IN DETAIL IN THIS GUARANTY.

37.    GUARANTOR ACKNOWLEDGES THAT NEITHER FXI NOR ANY OF FXI'S OFFICERS OR EMPLOYEES HAVE MADE ANY PROMISE OR REPRESENTATION, NOT INCORPORATED HEREIN, WHETHER ORAL, WRITTEN OR IMPLIED, TO CAUSE GUARANTOR TO SIGN THIS GUARANTY.

Exh. C 0065

GUARANTOR IS NOT SIGNING THIS GUARANTY IN RELIANCE ON ANY
PROMISE, CONDITION OR THE ANTICIPATION OF THE OCCURRENCE OF
ANY EVENT, AND THERE ARE NO ORAL UNDERSTANDINGS, STATEMENTS
OR AGREEMENTS WHICH HAVE NOT BEEN INCLUDED IN THIS GUARANTY.
GUARANTOR UNDERSTANDS THAT FXI HAS THE RIGHT TO ENFORCE
PAYMENT OF THE CREDIT AGAINST DEBTOR OR GUARANTOR IN ANY
ORDER AND FXI IS NOT OBLIGATED TO OBTAIN ANY OTHER OR
ADDITIONAL GUARANTORS OF THE CREDIT OR TO TAKE ANY OTHER
COURSE OF ACTION.

38.    This Guaranty constitutes the entire agreement between the parties with respect to
the subject matter of this Guaranty, and any and all previous or contemporaneous
correspondence, statements, or agreements by or between the parties hereto with respect
to the subject matter of this Guaranty (but not previous or other guarantees given to FXI
by Guarantor) are superseded hereby.  This Guaranty may be modified only by a written
instrument signed by the parties hereto.

39.    USA PATRIOT ACT ACKNOWLEDGEMENT – Guarantor acknowledges that
Federal law requires all financial institutions to obtain, verify and record information that
identifies each person who opens an account or obtains a loan.  Guarantor further
acknowledges that FXI will ask for Debtor's legal name, address, tax ID number or social
security number and other identifying information, and that FXI may also ask for
additional information or documentation or take other actions reasonably necessary to
verify the identity of Debtor, Guarantor or other related persons.

[SIGNATURE PAGE FOLLOWS]

Exh. C 0066

IN WITNESS WHEREOF, Guarantor has executed this Continuing Guaranty as of the 18th day of May 2010.

GUARANTOR:

_____
DAVID L. FARLEY, an individual

Social Security No.: 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

Address: 2891 VENEZIA
Chino Hills, CA 91709

Exh. C 0067

FORM B104 (08/07)                                                                    2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>FOAMEX INNOVATIONS OPERATING COMPANY | DEFENDANTS<br>DAVID L. FARLEY; ANATOMIC GLOBAL, INC. |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Kaye Scholer LLP<br>1999 Avenue of the Stars, 16th Floor<br>Los Angeles, CA 90067    Tel: 310-788-1000 | ATTORNEYS (If Known)<br>Winthrop Couchot    Stutman Treister & Glatt<br>660 Newport Center Dr.,Ste 400   1901 Ave of the Stars, 12th Fl<br>Newport Beach, CA 92660    L.A., CA 90067 |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☑ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Complaint for injunctive relief and appointment of a receiver for a non-debtor party under 11 U.S.C §§ 105, 363(b), and FRBP 7065.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property -§542 turnover of property
☐ 12-Recovery of money/property -§547 preference
☐ 13-Recovery of money/property -§548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false
    representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement,
    larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability -§523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
2 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
3 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state
    court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought
1 - Appointment of a receiver for a non-debtor third party under 11 U.S.C. §§105 and 363(b).

23301337.pdf

FORM B104 (08/07), page 2                                                        2007 USBC, Central District of California

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| David L. Farley | 6:11-bk-12031DS |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| Central District of California | Riverside | Deborah J. Saltzman |

## RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

**SIGNATURE OF ATTORNEY (OR PLAINTIFF)**

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|
| 2/14/11 | Kaye Scholer LLP<br>By Ashleigh A. Danker, Counsel for Foamex Innovations Operating Co. |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| Ashleigh A. Danker, Esq., CASB # 138419<br>KAYE SCHOLER LLP<br>1999 Avenue of the Stars, 16th Floor<br>Los Angeles, CA 90067<br>Tel: (310) 788-1000<br>Fax: (310) 788-1200<br>Email: adanker@kayescholer.com<br><br>*Attorney for Plaintiff* Foamex Innovations Operating Company | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>DAVID L. FARLEY<br><br>Debtor. | CHAPTER  11<br><br>CASE NUMBER 6:11-bk-12031-DS<br><br>ADVERSARY NUMBER 6:11-ap-    DS |
|---|---|
| Foamex Innovations Operating Company<br>Plaintiff(s),<br><br>vs.<br><br>David L. Farley and Anatomic Global, Inc.<br>Defendant(s). | *(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)*<br><br>**SUMMONS AND NOTICE OF STATUS CONFERENCE** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|

❏  **255 East Temple Street, Los Angeles**       ❏  **411 West Fourth Street, Santa Ana**

❏  **21041 Burbank Boulevard, Woodland Hills**    ❏  **1415 State Street, Santa Barbara**

☒  **3420 Twelfth Street, Riverside**

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**KATHLEEN J. CAMPBELL**
**Clerk of Court**

By: _____
                    *Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*                    23301336.pdf                    **F 7004-1**